THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PARIS ARNOLD, Defendant-Appellant.

First District (3rd Division)   No. 1—03—2213

Opinion filed June 30, 2004.—Rehearing denied July 20, 2004.

Michael J. Pelletier and Brett C. Zeeb, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Campos, and Elizabeth Novy, Assistant State's Attorneys, of counsel), for the People.

JUSTICE KARNEZIS delivered the opinion of the court:

Following a bench trial, defendant was convicted of first-degree murder (720 ILCS 5/9—1 (West 2000)) and was sentenced to 45 years' imprisonment; 25 years for murder with a mandatory 20-year add-on because the court found that defendant personally discharged a firearm during the commission of the murder (730 ILCS 5/5—8—1(a)(1)(d)(ii) (West 2000)). On appeal, defendant argues that: (1) the trial court erred when it denied his motion to quash arrest and suppress evidence; and (2) section 5—8—1(a)(1)(d)(ii) of the Unified Code of Corrections (730 ILCS 5/5—8—1(a)(1)(d)(ii) (West 2000)) violates the proportionate penalties clause as well as defendant's constitutional right to due process. We affirm.

## BACKGROUND

We discuss only those facts relevant to the disposition of this appeal. Prior to trial, defendant filed a motion to quash arrest and suppress evidence based on his warrantless arrest. At the hearing on defendant's motion, he argued that the police arrested him without probable cause. The following evidence was presented at the hearing.

Defendant testified that on July 30, 2001, he was living at 1330 W. 13th Street in Chicago, with his wife. At approximately 11 a.m. on that date, two detectives who told defendant that they wanted to question him approached him. The detectives asked defendant to stay there until they called the homicide detectives. Defendant told the detectives that he wanted to leave. The detectives then handcuffed defendant.

About 15 minutes later, another detective arrived. The detective put defendant in the back of a squad car and took him to a police station. At the police station, defendant made statements to an assistant State's Attorney. Defendant was never shown a warrant for his arrest.

Detective Gregory Swiderek of the Chicago police department testified that on the evening of April 2, 2001, he and his partner, William Soregen, received an assignment regarding a homicide that had taken place in a parking lot at 1350 West 14th Street in Chicago. Upon arriving at the scene, Detective Swiderek learned that a woman named Kareen Goodwin had been shot to death in a car.

On July 27, 2001, Detective Swiderek and other detectives were still investigating the shooting death of Goodwin. On that same date, Detective Swiderek interviewed Tony Robinson, who was in police custody. Robinson was being questioned regarding an unrelated murder. Detective Swiderek had a conversation with Robinson about the homicide of Goodwin. Robinson told Detective Swiderek that just before dark on the night Goodwin was killed, he was standing in the

lobby of the building located at 1410 West 14th Street with Gregory Brown when he saw Maurice Lebon's blue, four-door Chevy pass by. Brown asked Robinson if he wanted to "get" Lebon, meaning, to shoot Lebon. Robinson explained that Lebon was from a rival building and that Lebon owed Brown drug money. Robinson responded "no" and the two walked upstairs, where they ran into Antoine Truitt and an individual only known as "Boo."[1] Brown asked Truitt and Boo if they wanted to come with him to "whack" Lebon. Brown, Truitt and Boo walked downstairs while Robinson went upstairs to use cocaine. About 10 minutes later, Robinson came down to the lobby, where he saw Brown, Truitt and Boo dressed in black. Brown showed Robinson a chrome .25-caliber semiautomatic pistol. Truitt and Boo also had guns in their pockets. Robinson went back upstairs and saw Truitt and Boo outside walking north to the parking lot near the row houses located just to the east. Robinson also saw Brown walk south. Robinson saw Lebon's car parked in the parking lot between the row houses. Robinson heard gunshots.

A short while later, Brown returned and said, "I just whacked that n-----," meaning, that he shot Lebon. Brown also told Robinson that he put the gun in a garbage can by an incinerator. Robinson discovered that it was Goodwin that was killed inside Lebon's car. Robinson also told Detective Swiderek that he was not being entirely truthful because he was afraid of possible gang retaliation. Detective Swiderek told Robinson that he did not believe that Robinson was telling the whole truth because one of the persons Robinson claimed was involved in the shooting, Truitt, was dead at the time.[2]

On July 30, 2001, Detective Swiderek and Detective Soregen again spoke with Robinson. At that time, Robinson told the detectives that he had not been entirely truthful. He stated that Truitt was not with Boo and Brown the night Goodwin was killed, but that it was defendant who was there. He also stated that he was reluctant to name defendant because he knew defendant was a "general" in the New Breed Street gang. Robinson stated that everything else he previously told detectives was true. Robinson was then shown a photograph array and identified Boo, Brown and defendant as the individuals he saw on the night of the Goodwin murder.

Detective Swiderek testified that no promises had been made to Robinson in exchange for the information he provided regarding the Goodwin murder. Detective Swiderek knew of no arrest warrant for defendant.

---

[1]Boo was not conclusively identified by name, but Robinson identified a photograph of Boo.

[2]The parties stipulated that Truitt was murdered on April 5, 2001.

Detective Vasilopoulos of the Chicago police department testified that on July 30, 2001, at approximately 3:30 p.m., he received a telephone call from youth investigator Battaglia. Battaglia had just seen defendant in the area of 13th and Racine in Chicago. Detective Vasilopoulos knew Robinson had identified defendant as being involved in Goodwin's murder. The detective drove to 13th Street and Racine Avenue but, before he arrived, he learned that youth investigator Battaglia had already stopped defendant.

Detective Sanchez testified that on July 26, 2001, he arrested Robinson in relation to the murder of Phillip McKay. That day, Detective Sanchez had a conversation with Robinson regarding the murder of Goodwin. Robinson told him the names of the people involved in Goodwin's murder, but later changed his mind about the names. Robinson told Detective Sanchez that he could not tell him the real names because he was afraid if he named the persons who were really involved, his family would be harmed. Detective Sanchez testified that his report contained a narrative of his conversation with Robinson. Robinson told him that Brown, Boo and Truitt had killed Goodwin, but that was all he knew about the murder. Detective Sanchez went to Cook County jail the following day and interviewed Brown. Brown denied any involvement in the murder of Goodwin.

After the hearing on defendant's motion to quash arrest and suppress evidence, the trial court denied the motion, finding that the evidence presented was sufficient to show that the police "had ample, overwhelming probable cause to believe that the defendant was involved in the murder in this case." Following a bench trial, defendant was convicted of first-degree murder. This appeal followed.

## ANALYSIS

Defendant argues that the trial court erred in denying his motion to quash the warrantless arrest and suppress evidence because the police lacked probable cause for his arrest.

If a trial court finds that a warrantless arrest was based on probable cause, then the arrest is deemed lawful. *People v. Tisler*, 103 Ill. 2d 226, 237 (1984). When reviewing a trial court's decision regarding a motion to quash arrest and suppress evidence, we must accord great deference to the trial court's factual findings and credibility assessments, and we will reverse those findings only if they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). However, we review *de novo* the ultimate finding with respect to probable cause or reasonable suspicion. *People v. Gonzalez*, 204 Ill. 2d 220, 223 (2003).

Probable cause does not require proof beyond a reasonable

doubt but does require more than mere suspicion. *People v. Kidd*, 175 Ill. 2d 1, 22 (1996). Defendant has the ultimate burden of proving lack of probable cause throughout the hearing. *People v. Ross*, 60 Ill. App. 3d 857, 861 (1978). Whether probable cause exists is to be determined upon examination of the totality of the circumstances. *People v. Turner*, 240 Ill. App. 3d 340, 356 (1992). Probable cause exists if the totality of the circumstances known to the police at the time of a suspect's arrest is sufficient to warrant a reasonably prudent person to believe the suspect has committed a crime. *People v. Patterson*, 282 Ill. App. 3d 219, 227 (1996).

Defendant argues the totality of the circumstances known to the police at the time of his arrest was not such that a reasonably prudent person would believe that defendant had committed a crime. Much of defendant's argument focuses on the information given by Robinson. Defendant claims that Robinson was not a reliable informant because he was in police custody and police admitted he was a suspect in Goodwin's murder. Furthermore, defendant claims that the information provided by Robinson was not independently verified by police investigation.

Probable cause for a warrantless arrest can be based on information provided by an informant. *People v. Sturdivant*, 99 Ill. App. 3d 370, 373 (1981). Third-party information, whether the source of the information is identified or unidentified, an ordinary citizen or a paid informant, a victim, an eyewitness or other witness, is reliable if it bears some indicia of reliability. *People v. Adams*, 131 Ill. 2d 387, 397 (1989). An indicia of reliability exists when the facts learned through a police investigation independently verify a substantial part of the information learned from the informant. *People v. James*, 118 Ill. 2d 214, 225 (1987). However, the reliability of the informant is only one of the factors to be considered in the totality of the circumstances approach. *Adams*, 131 Ill. 2d at 397.

■ Clearly, the information provided by Robinson had "an indicia of reliability" because it independently corroborated information the police learned through their investigation. Detective Swiderek knew from his investigation into Goodwin's murder, and prior to speaking with Robinson, that Goodwin was shot in Lebon's blue, four-door, Chevy Celebrity. When Goodwin was shot, the car was in the parking lot between the row houses just east of the building located at 1410 14th Street. The police knew that three different firearms were used at the scene of the murder because three different cartridge cases had been found at the scene. Also, a .25-caliber semiautomatic handgun was found in a garbage can near an incinerator at approximately 1361 Loomis, in Chicago. A firearms expert determined that the gun was

used during the homicide. Detective Swiderek also knew that three black males, all wearing dark clothing, were seen fleeing from the scene.

The information given by Robinson corroborated the findings made during the initial investigation. Robinson told detectives that the car he saw parked in the parking lot that Brown had alerted him to was Lebon's car. Goodwin was shot and killed in a four-door blue Chevy belonging to Lebon as Robinson had described. Robinson described the location of the car in the parking lot between the nearby row houses. Detective Swiderek testified that looking from the upper floors of the building located at 1410 West 14th Street, Lebon's car would be visible. Robinson also told detectives that three individuals left the building, each having his own weapon. Three different types of cartridges were found at the scene. Robinson also told Detective Swiderek that Brown told him that after the shooting he disposed of his .25-caliber handgun in a garbage can near the scene of the shooting. Considering the totality of the circumstances in the case at bar, it is clear that probable cause to arrest defendant existed.[3]

■ Defendant next asserts that the statute which mandates the addition of 20 years to his 25-year sentence for murder, section 5—8—1(a)(1)(d)(ii) of the Unified Code of Corrections (730 ILCS 5/5—8—1(a)(1)(d)(ii) (West 2000)), is unconstitutional.

Public Act 91—404 (Pub. Act 91—404, § 5, eff. January 1, 2000) amended the penalty portion of various criminal offenses, including first-degree murder, by adding what is commonly referred to as the "15/20/25-to-life" mandatory sentencing enhancements when the designated offense involves the use of a firearm. 730 ILCS 5/5—8—1(a)(1)(d)(i), (a)(1)(d)(ii), (a)(1)(d)(iii) (West 2000). At issue in this case is the 20-year enhancement, which was added to defendant's sentence. The relevant provision states:

> "(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:
>
> (1) for first degree murder,
>
> (a) a term shall not be less than 20 years and not more than 60 years, or
>
> * * *
>
> (d) ***

---

[3]The State claims that probable cause also existed to arrest defendant with respect to the murder of Antoine Truitt. However, we need not address that issue as we have found probable cause existed to arrest defendant for the murder at issue here.

(ii) if, during the commission of the offense, the person personally discharged a firearm, 20 years shall be added to the term of imprisonment imposed by the court[.]" 730 ILCS 5/5—8—1(a)(1)(d)(ii) (West 2000).

There is a general presumption of validity that attaches to legislation, including statutes and their prescribed penalties. *People v. Dunigan*, 165 Ill. 2d 235, 244 (1995). Thus, in determining the validity of a statute, the court is instructed to presume that statutes enacted by the legislature are constitutional. *People v. Fuller*, 187 Ill. 2d 1, 10 (1999). As a result of this presumption, the party challenging a statute has the burden of proving that a constitutional violation exists. *People v. Cosby*, 305 Ill. App. 3d 211, 224 (1999). The question of whether a statute is constitutional is subject to *de novo* review. *People v. Moss*, 206 Ill. 2d 503, 520 (2003).

Defendant claims that section 5—8—1(a)(1)(d)(ii) (730 ILCS 5/5—8—1(a)(1)(d)(ii) (West 2000)), which provides that, "if, during the commission of the offense, the person personally discharged a firearm, 20 years shall be added to the term of imprisonment imposed by the court," violates the proportionate penalties clause of the Illinois Constitution and his constitutional right to due process. We consider each argument in turn.

The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Commonly, this clause is referred to as the proportionate penalties clause. *People v. Lombardi*, 184 Ill. 2d 462, 468 (1998).

In accordance with the Illinois Constitution, the Illinois Supreme Court has recognized three instances in which a violation of the proportionate penalties clause may occur:

"First, the proportionate penalties clause is violated where the punishment for a particular offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community. [Citation.] Second, the proportionate penalties clause is violated where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more harshly. [Citations.] Third, the proportionate penalties clause is violated where identical offenses are given different sentences." *People v. Davis*, 177 Ill. 2d 495, 503-04 (1997).

The comparison of different offenses and their penalties has been held by the Illinois Supreme Court to be an appropriate form of proportionality review. *Davis*, 177 Ill. 2d at 502; *Lombardi*, 184 Ill. 2d at 480. Nonetheless, when considering a possible proportionate penal-

ties violation by comparing different offenses, the court is obligated to make a two-pronged inquiry. This inquiry, commonly referred to as the "cross-comparison analysis," requires that a court determine: (1) whether the statutory purposes of the compared offenses are distinct, so that comparative proportionality review is not appropriate; and (2) whether the offense with the harsher penalty is more serious than the offense with the less severe penalty. *Lombardi*, 184 Ill. 2d at 475-76.

With regard to the first step, it is well settled that if the statutory purposes are different, comparative proportionality review is inappropriate. *Davis*, 177 Ill. 2d at 506. This is true because, where statutes are enacted for different purposes, we presume that the legislature considered different factors in crafting the respective punishments, and we therefore defer to the legislature's judgment. *Lombardi*, 184 Ill. 2d at 476.

Defendant asserts that a statutory penalty violates the proportionate penalties clause where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more severely. Defendant suggests that the less serious offense of murder based on a theory of accountability while personally discharging a firearm, even if the offender causes no harm to the victim, is given a harsher punishment than the more serious conduct of personally inflicting the fatal wounds by means other than a firearm. In support of this argument, defendant relies on our supreme court's decision in *People v. Moss*, 206 Ill. 2d 503 (2003).

In *Moss*, the court considered the constitutionality of the 15- and 20-year enhanced penalty provisions. *Moss*, 206 Ill. 2d 503. The court concluded that with respect to the offenses of aggravated kidnapping, armed robbery, and aggravated vehicular hijacking, the 15- and 20-year enhanced penalties were unconstitutionally disproportionate to the penalties for aggravated battery with a firearm and aggravated discharge of a firearm. *Moss*, 206 Ill. 2d at 531. However, the *Moss* court did not consider the 15- and 20-year enhanced penalty provisions provision with regard to first-degree murder, the only charge in this case. Accordingly, we find defendant's reliance on *Moss* to be misplaced. The comparison, if there is to be a comparison, is between murder with a firearm and murder "by other means."

Recently, in *People v. Moore*, 343 Ill. App. 3d 331 (2003), this court considered the 25-year enhanced penalty provision as it related to first-degree murder. In *Moore*, the court concluded that in enacting Public Act 91—404, the legislature intended to create two categories of first-degree murder: those committed without a firearm and those committed with a firearm. *Moore*, 343 Ill. App. 3d at 346. The court explained:

> "[T]he purpose of the penalties of sections 5—8—1(a)(1)(d)(i) through (d)(iii) is to more harshly punish those first-degree murderers who, respectively, carry a firearm; discharge a firearm; and discharge a firearm and cause great bodily harm, permanent disability, permanent disfigurement, or death. *Cf. Hill*, 199 Ill. 2d at 457(home invasion). Comparative proportionality review is inappropriate here because the new firearms provisions of the first-degree murder sentencing statute serve a second, more specific purpose and target a unique type of danger that is absent when the offender does not possess a firearm. See *Hill*, 199 Ill. 2d at 458. Given the pervasive and enhanced danger from an offender's possession of a firearm, the legislature's superior position in identifying and addressing the evils of gun-related violence, and the presumptive constitutionality of a legislative enactment, we conclude that defendant has not met his burden of proving that section 5—8—1(a)(1)(d)(iii) violates the proportionate penalties clause of the Illinois Constitution. See *Hill*, 199 Ill. 2d at 458-59." *Moore*, 343 Ill. App. 3d at 346.

We agree with the reasoning in *Moore*. In doing so we note that while murder has been characterized as "the most serious offense[ ]" (91st Ill. Gen. Assem., House Proceedings, May 13, 1999, at 67-68 (statements of Representative Turner); *People v. Sawczenko-Dub*, 345 Ill. App. 3d 522, 525-26 (2003)), murder while discharging a firearm, as in this case, is more egregious in terms of the seriousness of the offense solely because there is an unparalleled and heightened danger that results from an offender's discharge of a firearm. Accordingly, we hold that the enhanced penalty provision for personally discharging a firearm as applied to first-degree murder does not violate the proportionate penalties clause of the Illinois Constitution.

Finally, defendant alleges that the 20-year enhancement provision violates the due process clauses of both the United States (U.S. Const., amend. XIV) and Illinois Constitutions (Ill. Const. 1970, art. I), in that it punishes less culpable conduct more severely. Defendant, as in the aforementioned argument, suggests that first-degree murder and murder based on a theory of accountability are separate, distinct offenses. They are not. "[T]here are no separate offenses of capital murder versus noncapital murder, or of aggravated murder versus simple murder." *People v. Bloomingburg*, 346 Ill. App. 3d 308, 324 (2004). Accordingly, there cannot be separate offenses for first-degree murder and accountability murder. Consequently, we find that the enhanced penalty provision, as applied to first-degree murder, does not violate due process. The increase in penalty is a reasonable means of deterring the targeted conduct. *People v. Hill*, 199 Ill. 2d 440, 458 (2002).

Based upon our findings above, we affirm the judgment of the trial court.

Affirmed.

HOFFMAN, P.J., and SOUTH, J., concur.