THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY PICKENS, Defendant-Appellant.

First District (2nd Division) No. 1—04—0403

Opinion filed December 28, 2004, *nunc pro tunc* November 30, 2004.—Rehearing denied January 4, 2005.

James K. Leven, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Thor Martin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GARCIA delivered the opinion of the court.

On November 29, 2002, a misdemeanor complaint was filed against the defendant, Anthony Pickens, charging him with domestic battery (count I) (720 ILCS 5/12—3.2(a)(2) (West 2002)). Following a bench trial, the defendant was found guilty and sentenced to conditional discharge for a period of 12 months.

The defendant now appeals, arguing (1) the State presented insufficient evidence to prove him guilty of domestic battery beyond a reasonable doubt (720 ILCS 5/12—3.2(a)(2) (West 2002)), and (2) the

statutorily prescribed penalty for domestic battery (730 ILCS 5/5—6—1(c) (West 2002)) violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). We affirm.

## Background

The charges against the defendant stemmed from events occurring on November 29, 2002, Thanksgiving Day.

Courtney R. Pickens, the defendant's wife, testified that she, the defendant, and her 16-year-old son, Paul Kelsey, Jr., had plans to go to her sister's home for Thanksgiving dinner. An argument ensued between Courtney and the defendant regarding the family's Thanksgiving dinner plans. On cross-examination, Courtney testified that the defendant became upset when he learned dinner would not be ready when they arrived at her sister's home. Courtney testified that the defendant said something disrespectful regarding her sister, and Courtney uninvited the defendant to her sister's home. Courtney then testified that she and Paul went to her sister's home without the defendant and returned home around midnight.

Courtney testified that upon returning home she tried to enter the garage using the garage-door opener but it did not work. Courtney testified that when she and Paul left the house earlier in the evening, the garage door had been in proper working order. Courtney testified that she sent Paul into the house through the front door to see what the problem was. Courtney waited outside approximately five minutes and followed Paul into the house when he did not return. Courtney testified that she did not see the defendant when she entered the house. Courtney testified that Paul was in the garage; she went there too and discovered the garage door opener had been disconnected from the outlet.

Courtney testified that she went to the utility closet in the kitchen to get a stool and some tools to reconnect the power. Courtney testified that when she entered the kitchen she noticed the defendant lying on the sofa watching television, but she did not say anything to him. On cross-examination, Courtney agreed that the defendant did not say anything to her either and did not rant or rave. Courtney testified that she also noticed that clothing from her bedroom had been thrown all over the living-room floor. On cross-examination, Courtney clarified that her nightclothes, consisting of a pajama top and bottoms and a hair scarf, were strewn on the floor.

Courtney testified that when she returned to the garage, Paul stood on the stool and reconnected the power. The garage door successfully opened, and Courtney told Paul to pull the car in. Courtney testified that because Paul was a new driver, she directed him into the

garage from the top step of a landing connecting the garage to the house. Courtney described the landing as four steps, with a railing, and a door separating the landing in the garage from the house.

Courtney testified that as she was directing Paul into the garage, the defendant came to the door and tried to slam it shut. On cross-examination, Courtney testified that the defendant tried closing the door twice. Courtney testified that the first time that the defendant attempted to close the door, she hit the door with her hand and said, "I'm coming in." Courtney testified that her hand kept the door from closing all the way, but she removed her hand as she was scared it would get smashed. Courtney testified that while she was dealing with the defendant, Paul was slowly pulling the car into the garage.

Courtney testified that immediately thereafter, the defendant again tried to close the door, so she put the back of her foot on the door to prevent it from closing as she continued to direct Paul into the garage. On cross-examination, Courtney testified that she was using her right foot and that she was not sure whether the defendant actually saw her foot. Courtney testified that she continued saying, "I'm coming in." Courtney testified that the defendant did not respond to her but continued to exert pressure on the door in an attempt to close it. Courtney testified that with her back to the door, she braced the back of her foot against the door and held onto the railing for support; however, she did not have a chance to get her foot out of the door and it was smashed. Courtney testified that she screamed in pain and the defendant did not say anything but released the door. Courtney also testified that Paul jumped out of the car.

Courtney testified that she hobbled to the kitchen and the defendant told her to sit down. Courtney testified that she had bruises on her foot and her toes were numb. Courtney testified that there was no broken skin. Courtney testified that she called the police and while she was doing so, the defendant was walking around the family room. On cross-examination Courtney agreed that after she called the police the defendant was not acting aggressively toward her, saying evil words to her, or threatening her. Courtney testified that the police and paramedics arrived, she was interviewed, and her foot was examined. The paramedics concluded that her foot was probably not broken but she was taken to the emergency room. At the emergency room, her foot was wrapped and she was given crutches and pain medication. Courtney testified that she was on crutches for four days.

Paul testified that on the evening in question he was 16 years old. Paul also testified that Courtney was his mother and that the defendant was his stepfather. Paul testified that to celebrate Thanksgiving he went to his aunt's home for dinner. Paul testified

that before he went to his aunt's house, he heard Courtney and the defendant having a dispute, but could not recall what the argument was about. Paul testified that he and Courtney returned home from his aunt's house about midnight and were unable to open the garage door. Paul testified that when he and Courtney left the house earlier in the evening, they were able to open and close the garage door using the garage-door opener. Paul testified that Courtney told him to go into the house through the front door and see what was wrong. Paul testified that Courtney did not enter the house with him and that he did not have any contact with the defendant when he entered the house.

Paul testified that upon entering the house, he went into the garage and found that the power cord had been disconnected from the outlet. Paul testified that he told Courtney that the power cord was disconnected, and then he and Courtney went to get a stool and tools in order to plug the power cord back in. Paul testified that once the garage door was operational, Courtney told him to pull the car into the garage. Paul testified that he had only had his driver's license for a couple weeks, so Courtney directed him into the garage. Paul testified that Courtney was standing on the top step of the landing.

Paul testified that as he pulled the car into the garage, he saw the door from the garage into the house shut, and he heard Courtney say that "we're both coming in." Paul acknowledged that he had pulled the car midway into the garage and the car's window was rolled up. Paul testified that Courtney continued to guide him into the garage, but the door from the garage to the kitchen shut again. Paul testified that although Courtney was facing him, he could not see the lower portion of her body because of the railing; however, he "saw her *** holding the railing, and through her facial expressions, [she] look[ed] like she was trying to push the door open." Paul testified that he then heard Courtney scream. Paul testified that because the car was pulled in all the way, he jumped out and followed Courtney into the house. Paul testified that Courtney hopped into the house, through the family room, and into the kitchen. Paul testified that although he did not see Courtney's foot, he heard her call the police and saw the police and paramedics arrive, and he rode with her to the hospital.

The State rested, the defense motioned for a directed finding, and the trial court denied the motion. The defendant then took the stand.

The defendant testified that he, Courtney, and Paul planned to celebrate Thanksgiving with Courtney's sister. The defendant testified that Courtney never asked him about Thanksgiving Day plans, but told him that the holiday would be spent at her sister's. The defendant testified that he started getting ready around 3 p.m., and asked Court-

ney if they could stop by his brother's home to say "hi" to his relatives before going on to her sister's home. The defendant testified that Courtney said no "because she doesn't like people." The defendant testified that Courtney later explained that people made her nervous. The defendant testified that he and Courtney exchanged a few words and he called her sister "lame." On cross-examination, the defendant agreed that he was not happy that he and his wife had gotten into a fight.

The defendant testified that after their argument Courtney called her sister. The defendant testified that Courtney told him that she did not want to go to Thanksgiving dinner if he was going. The defendant testified that Courtney called her sister back, he spoke on the phone to her, and she said it would be fine for him to come to Thanksgiving dinner. The defendant testified that Courtney was not happy that he had been invited and got the defendant uninvited from her sister's home again. The defendant testified that he did not attend Thanksgiving Day dinner.

The defendant testified that about a half hour after Courtney and Paul had left the house, he went outside for a cigarette and discovered that the garage door was open. The defendant testified that he lowered the garage door and unplugged it because, "I told my wife on several occasions—excuse me—that to remember to close the garage door. Maybe this would help her remember to do that." On cross-examination, the defendant acknowledged that he unplugged the garage door to teach Courtney a lesson. The defendant testified that he then watched television in the family room until Courtney and Paul returned home. The defendant testified that the family room is around the corner from the door connecting the house and the garage. The defendant testified that someone came in through the front door, went into the garage, retrieved some items from the pantry, and went back out to the garage. The defendant testified that he never saw his wife come into the house.

The defendant testified that he was watching the television and noticed a big gust of wind. On cross-examination, the defendant testified that he was not upset with his wife, he was just cold. The defendant testified that the door between the house and the garage was open, he went to close it, and then he heard his wife scream. On cross-examination, the defendant acknowledged that he saw his wife standing on the landing between the garage and house but did not speak to her. The defendant testified that he only tried to close the door once. On cross-examination, the defendant disputed that Courtney blocked the door or told him that she was coming inside. The defendant testified that he heard Courtney scream, asked her what

was wrong, and told her to come sit down. The defendant testified that Courtney told him "to get the hell away from her." The defendant testified that Courtney called the police and he was eventually arrested in his pajamas.

Following the defendant's testimony, the State and defense made closing arguments. The trial court then went through the facts it found most persuasive. The trial court noted that on Thanksgiving Day there was a "rather large argument" between the defendant and Courtney. The trial court noted that the defendant had been uninvited to Courtney's sister's home and did not attended Thanksgiving at his brother's house either. The trial court noted that the defendant stated he was not angered by having to spend Thanksgiving alone.

The trial court also noted that when Courtney and Paul returned home at midnight everyone agreed that they were unable to use the garage-door opener to get into the garage. The trial court also noted that Courtney was standing on the landing, directing her son into the garage, and the defendant admitted seeing her on the landing. The trial court noted that Courtney's attention would have been directed to the garage as she was directing Paul as he parked the car. The trial court noted that the defendant testified he came up to the door, said nothing to Courtney, and just closed the door. The trial court noted that "[i]f your [sic] cold, you simply [say] 'hey, close the door.' But he didn't do that." The trial court also noted that the defendant's story that he only closed the door once did not make sense. "If she clearly has her back to him, which she had to have, okay, how does she get her foot in the door in that split second of him putting his hands on the door and closing the door? That's a split second. How is she able to suddenly get her foot in the door? That can't possibly happen."

The trial court then stated that it did not believe the defendant's version of events and found that the State had proved beyond a reasonable doubt that a domestic battery had taken place based on Courtney's testimony. "She testified that upon stopping the door [with her hand], the defendant then slammed the door on her [foot]." The trial court then found the defendant guilty of domestic battery (720 ILCS 5/12—3.2(a)(2) (West 2002)), and the case proceeded for sentencing.

In mitigation, defense counsel emphasized that the defendant worked on government contracts and if there was a conviction on his record he could lose his job. Defense counsel asked the trial court to "impose a lesser charge than domestic battery, and that would be battery, reckless conduct, so that he would qualify for supervision, because he doesn't have a background, so he can spare his job." The defendant told the trial court that he did not intend to hurt Courtney, he loved Courtney, and he had always tried to do the best he could for Courtney and Paul.

The trial court found the defendant's statements unpersuasive:

"Well, unfortunately, that's not what we're talking about, what happened most of the time or almost all the time; but we're talking about what happened that night. And you certainly did not love your wife that night."

The trial court then sentenced the defendant to one year's conditional discharge as well as anger management classes. Regarding defense counsel's request for supervision, the trial court stated:

"I have found him [the defendant] guilty of domestic battery. Okay. Under the statute of domestic battery, supervision is not possible. You as an attorney know that. Okay. He has been charged, he's been proven. Now, I'm sorry that may affect his job and his employment, things like that. The last I checked, though, I'm bound by the law."

This appeal followed.

## ANALYSIS

### I. Guilt Beyond a Reasonable Doubt

The defendant first argues that the State did not succeed in proving him guilty of domestic battery (720 ILCS 5/12—3.2(a)(2) (West 2002)) beyond a reasonable doubt. Specifically, the defendant contends that the State failed to show that the defendant intentionally or knowingly closed the door on Courtney's foot. The State maintains the facts of this case were sufficient to allow the trial court to convict the defendant.

"A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985). When the defendant challenges the sufficiency of the evidence, it is not the function of a reviewing court to retry the defendant. *Collins*, 106 Ill. 2d at 261. Moreover, a reviewing court will not substitute its judgment for that of the trier of fact on issues regarding the weight of the evidence or the credibility of witnesses. *People v. Cooper*, 194 Ill. 2d 419, 431, 743 N.E.2d 32 (2000). Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (Emphasis omitted.)' " *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). This standard of review applies regardless of whether (1) the evidence is direct or circumstantial, or (2) the defendant receives a bench or jury trial. *Cooper*, 194 Ill. 2d at 431.

■ With these principles in mind, we consider the defendant's

challenge to the sufficiency of the evidence against him. Pursuant to Section 12—3.2(a)(2) of the Criminal Code of 1961, to prove a defendant guilty of domestic battery four elements must be proven beyond a reasonable doubt. 720 ILCS 5/12—3.2(a)(2) (West 2002). Specifically, it must be proved that the defendant (1) intentionally or knowingly, (2) without legal justification, (3) made physical contact of an insulting or provoking nature, (4) with a family or household member. 720 ILCS 5/12—3.2(a)(2) (West 2002); see *People v. Taher*, 329 Ill. App. 3d 1007, 1018, 769 N.E.2d 1021 (2002). The defendant's brief asserts that his "insufficiency of the evidence argument focuses on the first element."

■ Specifically, the defendant maintains that he only tried to close the door between the garage and the house one time and that he did not intentionally or knowingly smash Courtney's foot in the door. The trial court explicitly stated that it did not believe the defendant's version of events. Specifically, the trial court noted that it did not believe the defendant's assertion that he only tried to close the door one time. Instead, the trial court found Courtney's testimony, that the defendant tried to close the door twice, to be more plausible. The trial court noted that Courtney's back was to the defendant because she was directing Paul as he pulled the car into the garage. The trial court determined it would not be possible for Courtney to place her foot in the doorway in the split second it took for the defendant to close it. The trial court found that Courtney placed her foot in the doorway after she had stopped the defendant from closing the door the first time. "She testified that upon stopping the door [with her hand], the defendant then slammed the door on her [foot]."

The defendant's reference to *People v. Barrington*, 15 Ill. App. 3d 445, 304 N.E.2d 525 (1973), is not instructive. The *Barrington* court noted, "the requisite mental state for a crime may be proved by acts and circumstances surrounding a defendant's conduct"; however, the *Barrington* court found that in that case, there were no circumstances from which a mental state could be inferred. *Barrington*, 15 Ill. App. 3d at 446-47. As previously stated, the trial court in this case specifically emphasized that it did not believe the defendant only attempted to close the door one time. Instead, the trial court believed that the defendant had tried to close the door twice. Once, when Courtney prevented the door from closing by stopping it with her hand. Then the defendant, having failed to close the door the first time, pushed the door closed a second time, when the back of Courtney's foot was caught in the door as she tried to keep it open. The trial court found Courtney's testimony more credible than that of the defendant and concluded from Courtney's testimony that the defendant was guilty of domestic battery.

The defendant's acts, and the circumstances surrounding Courtney's injury, demonstrate that the defendant did intentionally or knowingly harm his wife. See *Barrington*, 15 Ill. App. 3d at 446-47. After reviewing Courtney's testimony ourselves, we find that the trial court could have concluded from Courtney's testimony alone that the defendant was guilty of domestic battery beyond a reasonable doubt. *Taher*, 329 Ill. App. 3d at 1018. Therefore, the defendant's conviction is affirmed.

## II. Proportionality

■ The defendant next argues that the statutory penalty for domestic battery (730 ILCS 5/5—6—1(c) (West 2002)) "violates the proportionate penalties clause of the Illinois Constitution because it permits judges to grant supervision to defendants convicted of a Class A misdemeanor such as simple battery, but denies the judge that same discretion for those defendants convicted of domestic battery, [which is] also a Class A misdemeanor."

The State maintains that the offenses of battery and domestic battery are not identical or similar and that "the unavailability of supervision is proper where the offense of domestic battery is more serious than battery."

Although the defendant failed to present this issue to the trial court, a constitutional challenge to a statute may be raised for the first time on appeal. *People v. Vilces*, 321 Ill. App. 3d 937, 943, 748 N.E.2d 1219 (2001). Whether a statute is constitutional is a matter of law that we review *de novo. People v. Graves*, 207 Ill. 2d 478, 482, 800 N.E.2d 790 (2003).

We begin by noting that "[s]tatutes are presumed constitutional, and the party bringing a constitutional challenge to a statute has the burden of clearly establishing a constitutional violation." *People v. Lombardi*, 184 Ill. 2d 462, 468, 705 N.E.2d 91 (1998). "The Illinois Constitution provides that '[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' " *People v. Arnold*, 349 Ill. App. 3d 668, 674, 812 N.E.2d 696 (2004), quoting Ill. Const. 1970, art. I, § 11. This is commonly referred to as the proportionate penalties clause. *Lombardi*, 184 Ill. 2d at 468. The Illinois Constitution empowers the legislature to define the conduct constituting a crime and the correlating punishment, as "[t]he legislature is 'more aware of the evils confronting our society and therefore is more capable of measuring the seriousness of various offenses.' " *Lombardi*, 184 Ill. 2d at 469, quoting *People v. Koppa*, 184 Ill. 2d 159, 171, 703 N.E.2d 91 (1998). For the foregoing reasons, courts are reluctant to invalidate penalties established by the legislature. *Lombardi*, 184 Ill. 2d at 469.

Our supreme court has recognized three instances in which a statute will be found to violate the proportionate penalties clause. *Lombardi*, 184 Ill. 2d at 474.

"First, a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. Second, a penalty is invalid under the proportionate penalties clause where similar offenses are compared, and conduct that creates a less serious threat to the public health and safety is punished more severely. Third, there is a violation of the proportionate penalties clause when identical offenses are given different sentences." *People v. Hill*, 199 Ill. 2d 440, 452, 771 N.E.2d 374 (2002), citing *Lombardi*, 184 Ill. 2d at 474.

Section 5—6—1(c) of the Unified Code of Corrections states:

"The court may, upon a plea of guilty or a stipulation by the defendant of the facts supporting the charge or a finding of guilt, defer further proceedings and the imposition of a sentence, and enter an order for supervision of the defendant, if the defendant is not charged with a Class A misdemeanor, as defined by the following provisions of the Criminal Code of 1961: Sections 12—3.2 ***." 730 ILCS 5/5—6—1(c) (West 2002).

In this case, the defendant contends that the unavailability of supervision for those found guilty of domestic battery violates the proportionate penalties clause under the second and third tests. We will address each argument in turn.

A. Test 3—Domestic Battery and Battery Not Identical Offenses

In support of his assertion that "battery and domestic battery must be construed as identical offenses," the defendant notes that "[t]he language of the statute is the best indicator of the legislature's intent. [Citation.] As can be readily discerned, the language of the two statutes is virtually identical." However, under the "identical elements test," "the elements of the respective offenses must be *identical* before the proportionate penalties clause will be implicated." (Emphasis in original.) *Graves*, 207 Ill. 2d at 482-83. The offenses the defendant seeks to put at issue in this case, domestic battery and battery, do not share identical elements.

A person commits domestic battery where he intentionally and knowingly and without legal justification makes physical contact of an insulting nature with any household or family member. 720 ILCS 5/12—3.2(a)(2) (West 2002). Thus, to secure a conviction for domestic battery, the State must prove that the defendant (1) intentionally or knowingly, (2) and without legal justification, (3) made physical contact of an insulting nature, (4) with a household or family member. 720

ILCS 5/12—3.2(a)(2) (West 2002). By contrast, a person commits battery if he intentionally or knowingly and without legal justification makes physical contact of an insulting or provoking nature with an individual. 720 ILCS 5/12—3(a)(2) (West 2002). Thus, to secure a conviction for battery, the State must prove that the defendant (1) intentionally or knowingly, (2) without legal justification, (3) made physical contact of an insulting or provoking nature, (4) with an individual. 720 ILCS 5/12—3(a)(2) (West 2002).

The distinction between these two offenses is plain. Although both offenses require that the defendant intentionally or knowingly make physical contact of an insulting or provoking nature (720 ILCS 5/12— 3(a)(2), 12—3.2(a)(2) (West 2002)), domestic battery requires additional proof that the offense was performed on a family or household member (720 ILCS 5/12—3.2(a)(2) (West 2002)), while battery only requires that it be shown the offense was performed on an individual (720 ILCS 5/12—3(a)(2) (2002)).

"Under the identical elements test, the proportionate penalties clause is violated 'where offenses with identical elements are given different sentences.' " *Graves*, 207 Ill. 2d at 485, quoting *People v. Moss*, 206 Ill. 2d 503, 522, 795 N.E.2d 208 (2003). Here, the offenses clearly do not share identical elements, and these two sections target distinct conduct. Consequently, the sentences for those offenses do not violate the proportionate penalties clause under the third test.

B. Test 2—Domestic Battery and Battery Not Similar Offenses

The defendant also asserts that "[s]ection 5—6—1 is also unconstitutional under the second *Lombardi* test, which compares similar offenses to determine whether the less serious offense is subjected to a more severe penalty." The defendant specifically asserts that "[i]f battery and domestic battery cannot be construed as functionally identical offenses, then they must be regarded as similar offenses." The defendant emphasizes that "[t]hey both target the same felonious conduct," and he maintains that "since all family or household members are also individuals, the domestic battery statute does not cover any harm that is not already addressed by the battery statute."

"The comparison of different offenses and their penalties has been held by the Illinois Supreme Court to be an appropriate form of proportionality review." *Arnold*, 349 Ill. App. 3d at 674. The second test used to determine whether a proportionate penalty violation has occurred requires us to perform a two-step inquiry that is commonly referred to as a "cross-comparison analysis." See *Arnold*, 349 Ill. App. 3d at 675. We first determine whether the purposes of the compared

offenses are distinct, rendering a cross-comparison inappropriate. *People v. Milash*, 329 Ill. App. 3d 153, 155, 769 N.E.2d 131 (2002). "If the purposes are related, we ask whether the offense with the greater penalty is more serious than the offense with the lesser penalty. [Citation.] If so, the greater penalty is constitutionally proportionate." *Milash*, 329 Ill. App. 3d at 155.

Regarding the first prong, "it is well settled that if the statutory purposes are different, comparative proportionality review is inappropriate. [Citation.] This is true because, where statutes are enacted for different purposes, we presume that the legislature considered different factors in crafting the respective punishments, and we therefore defer to the legislature's judgment." *Arnold*, 349 Ill. App. 3d at 675. Accordingly, we must first determine whether the legislature had a common or related purpose when enacting the domestic battery and battery statutes.

Although the defendant's brief states "[t]he first prong of the *Lombardi* cross-comparison test has been satisfied since the purposes of the battery and domestic battery statutes are related, if not identical," in contravention of Supreme Court Rule 341(e)(7), the defendant provides no citation to authority to support his contention. See *Fedanzo v. City of Chicago*, 333 Ill. App. 3d 339, 348, 775 N.E.2d 26 (2002) (waiver appropriate where constitutional challenges not supported by any authority); 188 Ill. 2d R. 341(e)(7). Moreover, the defendant's reply brief provides us no further guidance:

> "The State agrees that a defendant commits battery or domestic battery when he or she: 1) intentionally or knowingly; 2) without legal justification; 3) causes bodily harm or makes physical contact of an insulting or provoking nature. The fourth element, the classification of [the] victim, is either identical or similar because battery applies to all individuals including family or household members to which domestic battery applies. *** The purposes of battery and domestic battery are either similar or identical because both are designed to punish guilty individuals who have caused another individual bodily harm or who have made physical contact with another individual of an insulting or provoking nature and to protect society in general. Cross comparison analysis is appropriate."

"Contentions supported by some argument but absolutely no authority do not meet the requirements of Supreme Court Rule 341(e)(7)." *Eckiss v. McVaigh*, 261 Ill. App. 3d 778, 786, 634 N.E.2d 476 (1994). We therefore find this issue waived.

However, even if we examined whether the legislature had a common purpose in enacting the statutes, we would not find one. We note

that "[t]he plain language of section 12—3.2(a) indicates that the activity which is the subject of the statute is domestic battery." *Taher*, 329 Ill. App. 3d at 1015; 720 ILCS 5/12—3.2(a)(2) (West 2002). It is apparent on the face of section 12—3.2 that the legislature's goal was ultimately to protect family and household members from physical contact of an insulting and provoking nature made by another member of their household or family. 720 ILCS 5/12—3.2(a)(2) (West 2002); see *Koppa*, 184 Ill. 2d at 169 (plain language of statute is best indicator of legislative intent). While both the domestic battery and battery statutes seek to protect the public from intentional or knowing physical contact made without justification, the focus of the domestic battery statute is on prohibiting inappropriate contact between family or household members. Accordingly, because the statutes have distinct purposes, we must presume the legislature considered different factors in establishing the penalties for each of these offenses. *Lombardi*, 184 Ill. 2d at 480.

## CONCLUSION

For the foregoing reasons, the conviction and sentence imposed by the trial court are affirmed.

Affirmed.

BURKE, P.J., and WOLFSON, J., concur.