2014 IL App (1st) 141703
No. 1-14-1703
Opinion filed December 31, 2014

FIFTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* EDGAR C., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 13 JD 50108 |
| v. | ) | |
| | ) | |
| Edgar C., a Minor, | ) | The Honorable |
| | ) | Richard F. Walsh, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent Edgar C., a 16-year-old minor at the time of the offense, was found guilty of robbery, theft and battery and adjudicated delinquent and sentenced to five years' probation.

¶ 2        On this direct appeal, respondent requests this court: (1) to vacate his theft adjudication because it stems from the same physical act as his robbery adjudication and thus violates the one-act, one-crime rule (*e.g., In re Samantha V.*, 234 Ill. 2d 359, 375, 378-79 (2009) ("the one-act, one-crime rule applies to juvenile proceedings," and a violation of the rule constitutes plain error under the second prong of the plain error doctrine)[1]; *People v. Dressler*, 317 Ill. App. 3d 379, 387-88 (2000) (vacating defendant's theft charge under the one-act, one-crime rule because it stemmed from the same act as his armed robbery charge)); and (2) to modify his sentence of five years' probation so that it terminates on his twenty-first birthday as required by the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/1-1 *et seq.* (West 2012)). Section 5-755 of the Act provides that: "The wardship of the minor *** automatically terminates when he or she attains the age of 21 years ***." 705 ILCS 405/5-755 (West 2012); *In re Jaime P.*, 223 Ill. 2d 526, 534 (2006) (holding that there is a "jurisdictional cap of 21 years" on the 5-year probation requirement). The State agrees and joins in both these requests, and we so order them.

---

[1] An error rises to the level of plain error under the second prong of the plain error doctrine when it "is so serious [that] it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *In re Samantha V.*, 234 Ill. 2d at 368 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 3        In addition, respondent argues:  (1) that his trial counsel was ineffective for failing to file a motion to quash arrest either before or during trial; and (2) that the mandatory probation provision of section 5-715(1) of the Act (705 ILCS 405/5-715(1) (West 2012)) violates his equal protection rights under the federal and state constitutions.  U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2.

¶ 4        Respondent asked us to remand for resentencing only if we strike the mandatory probation provision of the Act.  However, he did not request a resentencing if we vacate only the lesser-included theft charge.

¶ 5        For the following reasons, we do not find respondent's ineffectiveness and equal-protection claims persuasive and we affirm his adjudication of delinquency for robbery and battery, but we vacate his theft adjudication and modify his five-year sentence of probation to terminate on his twenty-first birthday, which will be January 16, 2018.[2]

¶ 6                                    BACKGROUND

¶ 7                              I. Pretrial Proceedings

¶ 8        Since the victim, J.B., age 16, was also a minor at the time of the offense, and since he has a distinctive first name, we use his initials instead of his full

---

[2] In their appellate briefs, both parties stated that respondent would turn 21 on January 16, 2019.  However, at oral argument, both parties confirmed that he will turn 21 on January 16, 2018.

name. Illinois Supreme Court Rule 660(c) provides that in all appeals filed from proceedings under the Act, the "involved" minors shall be identified by first name and last initial only or by initials only; and that the method of using initials only is "to be used when, due to an unusual first name or spelling, the preferred method would create a substantial risk of revealing a minor's identity." Ill. S. Ct. R. 660(c) (eff. Oct. 1, 2001).

¶ 9        On August 22, 2013, the State filed a petition for adjudication of wardship alleging that respondent, who was born on January 16, 1997, and was then 16 years old, committed robbery, theft and battery of J.B. on July 31, 2013. Both the robbery and theft counts alleged that respondent wrongfully took a cell phone from J.B. and the battery count alleged that respondent slapped J.B. in the face with his open hands.

¶ 10        On September 6, 2013, respondent was arraigned with his mother and father present, and an assistant public defender (APD) was appointed to represent him. The APD then "acknowledge[d] receipt of the discovery packet" in open court. However, this "discovery packet" is not part of the appellate record, and the transcript does not describe the packet's contents. A written order, entered by the trial court on September 6, 2013, also stated: "Discovery tendered."

¶ 11    As for discovery, the appellate record contains only the State's one-page answer to respondent's discovery request. The State's answer was filed on September 6, 2014, which is the same day that the APD acknowledged in open court that she received a "packet" from the State. The answer stated that the State may call as witnesses any person named in police reports and other documents which are "attached to and incorporated as part of this answer." The answer stated that witness statements were described in these documents, as well as items that may be used at trial as physical evidence. The answer also stated that these documents described "the identification procedure." However, the answer in the appellate record does not have any documents attached to it.

¶ 12    It appears that defense counsel must have received police reports because, subsequently at trial, defense counsel marked a police inventory form as Defense Exhibit No. 1 for identification. However, none of the police reports, including the inventory form, are in the appellate record.

¶ 13                                II. Trial

¶ 14                         A. The Victim's Testimony

¶ 15    On March 14, 2004, the bench trial commenced with the victim J.B. as the State's first witness. J.B. testified that he is 16 years old and that, on July 31, 2013, he left his grandmother's house at approximately 1 p.m. and dribbled his basketball to a park near 97th Street and California Avenue where he

remained until approximately 2:30 p.m. J.B. then observed a group of four teenagers, approximately 20 to 25 feet away. Two boys were between 15 and 17 years old; one boy was between 18 and 20 years old; and the one girl was approximately 17 or 18.

¶ 16    J.B. testified that he had never seen these four teenagers before, and he was about to turn around and go home, when one of the boys called out: "Come here so I can give you some advice." The speaker was wearing a purple jumpsuit with a black stripe on the sleeves. Next to the speaker was a boy in a black jeans jacket. The other two people in the group, a boy and a girl, were sitting on top of a slide. J.B. pretended that he did not hear the speaker and turned around to head home, but the speaker called out to J.B. again. Then J.B. walked over to the speaker. The boy in the purple jumpsuit asked if J.B. was in the "BDK" gang. J.B. said no and that he did not live near the park. The boy then stated: "If you are not with us, you are against us." The boy added: "Now I need to get my three slaps in." Then the boy slapped J.B. three times on J.B.'s left cheek with the boy's open right hand.

¶ 17    J.B. testified that, next, the boy in the black jeans jacket said, "Now I gotta get my slaps in"; and he slapped J.B. three times on J.B.'s right cheek with his left hand. Then they told J.B. he could go home, and J.B. started walking away, when the boy in the purple jacket called him back.

¶ 18    The prosecutor then asked J.B. if he could look around the courtroom and identify the person who "had this purple jacket that day" and who had slapped J.B. three times. J.B. then identified respondent. However, as we will explain later, this in-court identification subsequently proved to be confusing because, later in his testimony, J.B. related how, at the police station, he identified a photograph of respondent as the boy in the black jacket. See *infra* ¶¶ 29-30.

¶ 19    After the in-court identification, the prosecutor phrased his questions asking about the "minor respondent." Thus, at this point, in describing J.B.'s testimony, we will use the term "respondent" when it is clear that J.B. is responding to the prosecutor's questions about the "minor respondent."

¶ 20    J.B. testified that, when respondent called J.B. back, J.B. said no and that he was going to keep walking. Then respondent stood up and reached toward his pocket, unzipped it and said "Don't make me make this call," while also reaching his hand inside the pocket. J.B. thought he might have a weapon in his pocket and so he stated: "I don't want any trouble." Then respondent told J.B. to sit down in the wood chips, which he did. As J.B. was sitting down, his cell phone fell out of his pocket and J.B. picked it up and was about to place it back in his pocket, when respondent asked J.B. if he could use J.B.'s phone to make a call.

¶ 21     J.B. testified that he said no because earlier he had observed three phones fall out of respondent's pocket; so J.B. asked respondent why he could not use one of those three phones to make his call. Respondent said "Don't make me make this call," while reaching towards his pocket again. Then J.B. handed respondent his phone and said:  "Okay. Just one call."   After J.B. handed respondent his phone, respondent started walking away with it.  J.B. then started following respondent but the boy in the black jacket stopped J.B. and told J.B. to come back, so J.B. sat back down.

¶ 22     J.B. testified that, four or five minutes later, the boy in the black jacket said that his friend was around the corner, and that J.B. should walk straight and make a right and his friend would be sitting on the porch of a house with J.B.'s phone waiting for J.B.  Following these instructions, J.B. walked around the corner and nobody was there.  J.B. then walked back to the park, and the group had left.  The whole event lasted approximately 10 minutes.

¶ 23     J.B. testified that his phone was a white Samsung Galaxy with a red back case which had a flap to cover the front. J.B. then identified several photographs of his phone and his "sim card," which he explained, was a card which was inserted into the phone and stored all his contacts and data.  After the event, J.B. walked back to his grandmother's house and told his mom what had happened, and she called the police.  His father told him to come with him

into his father's vehicle and they drove around the block looking for the offenders. However, a couple of minutes later, his grandmother called his father saying that the police had arrived at the house; so they turned around and returned to the house. Back at the house, J.B. entered the police vehicle, while his parents remained at the house. J.B. and the officer were driving to the police station when the officer received a call from another officer that individuals matching J.B.'s description had been located.

¶ 24 J.B. testified that they then drove to a location near 95th Street and Western Avenue, in front of a Potbelly's restaurant. When they arrived, J.B. remained in the police vehicle and the officer asked if he could identify the boys across the street. As he sat in the police vehicle, J.B. was approximately 20 feet away from the boys. Respondent was one of the boys whom J.B. identified, and J.B. identified respondent as one of the boys who had slapped J.B.

¶ 25 Although J.B. did not specify how many boys were standing across the street, J.B. testified that he "identified [1] the boy in the black jacket and [2] the boy that was sitting on the slide with the girl." However, the boy who had been previously sitting on the slide with the girl was now "wearing the purple jacket that [J.B.] saw on the guy who took [his] phone initially." J.B. told the police that, during the offense, the boy on the slide "was on the side."

¶ 26     The prosecutor then asked a question that was confusing: "And after you made the identification of the Minor Respondent and the other gentleman in the black jacket, where did you go?" Imbedded in this question is the assumption that J.B. had identified respondent as the boy on the slide, who was wearing the purple jacket during the identification but who had *not been wearing it during the offense*. However, the prosecutor had previously referred to the boy who had been wearing the purple jacket during the offense, as the "Minor Respondent." Also, although J.B. testified that he had identified both (1) the boy in the black jacket and (2) the boy who was previously sitting on the slide, J.B. had not specified in his testimony which one was respondent.

¶ 27     J.B. testified that, after the show-up identification on the street, the police transported J.B. to a police station where the police returned his cell phone and SIM card. However, when he inserted the SIM card into the phone, there was a different password on the phone. J.B. was able to crack the password and then was able to access his contacts.

¶ 28     On cross-examination, J.B. testified that when he first arrived for the show-up identification, he was a "little confused" because "they had all different clothes except for the boy in the jean jacket." At the identification, J.B. observed a boy who was now "in the purple jacket," but "that's not the guy who was really doing anything." Regarding the boy in the black jean jacket,

J.B. testified: "I identified him, I was like, I think that's him who was there." The police later informed J.B. that they had found J.B.'s cell phone on the boy in the black jean jacket.

¶ 29    The following exchange then took place:

"DEFENSE COUNSEL: So you never actually picked out my client at the scene of the Potbelly's is that right?

J.B.: No, not ---

ASSISTANT STATE'S ATTORNEY (ASA): Objection. Withdraw[n].

DEFNSE COUNSEL: You didn't, correct?

J.B.: No.

DEFENSE COUNSEL: Okay. So it wasn't until you were back at the police station and the police had actually showed you a photo of my client and told you that the phone was found on his person that you identified him, is that correct?

J.B.: Yes."

¶ 30    Defense counsel then asked, "at the scene of the Potbelly's, my client was not wearing the purple jacket, correct?" and J.B. responded "no." J.B.'s "no" to defense counsel's "not" question makes it seem as though respondent *was* wearing the purple jacket. But then defense counsel asked "this other

11

gentleman *** was wearing the purple jacket, is that right?" and J.B. responded: "Yeah."

¶ 31    Defense counsel asked, "you were able to solidly identify the boy in the jean jacket when you were in the car in front of the Potbelly's, is that right," and J.B. replied yes. Since J.B. had just testified on cross that he did not identify respondent at "the Potbelly's," then the boy in the black jacket could not have been respondent.

¶ 32    On cross, he testified that he could not "remember the exact time" but the events occurred "between 2:30 and 5:00-ish" and "before sunset." However, on direct, J.B. had testified that these events occurred around 2:30 p.m. On cross, J.B. testified that, although the events occurred a year ago and he had not seen respondent since then, he could positively identify respondent in court. J.B. conceded that respondent was the only other black teenager in the courtroom besides J.B. and the only person sitting at the defense table besides defense counsel.

¶ 33    On cross, J.B. testified that, at the show-up identification, he was alone in the police vehicle with one other officer and the other officers were outside. The officers had detained a group of four people on one side of the street and one person on the other side of the street. Respondent was with the group, and the one person by himself was the boy who was then wearing the purple jacket.

Of the group of four people, J.B. was able to identify the boy in the black jean jacket.

¶ 34     On redirect examination, the following exchange occurred:

"ASA:  [J.B.], to be clear, when you identified the Minor Respondent on the scene at the Potbelly's, you identified him as having done what?

J.B.:  I identified him as one of the main guys who was talking to me that whole time at the park.

ASA:  All right.  Were you confused in any way on that day?

J.B.:  Yeah.

ASA:  Why were you confused?

J.B.:  They were all wearing different clothes and it just happened sort of fast.

ASA:  Did you have a good opportunity to look at the Minor Respondent's face that day in the park?

J.B.:  Not really."

The ASA then asked if there was anything unusual about respondent's face, and J.B. replied that he had "a square head."

¶ 35     The ASA then asked J.B. if he had any doubt, and the following exchange occurred:

"ASA: Did you have any doubt when you identified him to the police at the Potbelly's that he was one of the people? Did you have any doubt that he was there?

J.B.: I had doubt until they pulled up his picture and showed me at the station close up."

J.B. explained that his doubt was due to "the clothes."

¶ 36    On recross, defense counsel asked:

"DEFENSE COUNSEL: You didn't know if he was involved until the police actually showed you his photo and told you that your phone was recovered on him, is that right?

J.B.: Yes, ma'am."

¶ 37                    B. Detective Watts

¶ 38    Detective Watts, who did not testify to his first name, stated that he had been a police officer in Evergreen Park for 10 years. On July 31, 2013, he investigated a robbery in Evergreen Park that occurred at 97th Place and California Avenue in Veterans' Park. After receiving a call that the offenders were walking away from the scene, he and his partner, Sergeant Franklin, traveled there in an unmarked police vehicle. Although Watts was in civilian clothes, he was wearing a bulletproof vest with "police identifiers" over his

14

clothes. The description they received of the offenders was that there were "three male Blacks," one with a purple jacket and the others had dark clothing.

¶ 39    Watts testified that, when he arrived, Officer Linn had already stopped individuals fitting that description. Watts observed two black male teenagers wearing dark clothes and standing among a group of teenagers. Watts identified himself to the teenagers and spoke with respondent and another minor respondent. Watts then identified respondent in court.

¶ 40    However, as we describe below in the section on Linn's testimony, Linn later testified that he stopped two men but not respondent.

¶ 41    Watts testified that, when he spoke to respondent on the street, it was 5:15 p.m., and only Watts and Sergeant Franklin were present. Watts explained why they were stopping them and they denied being involved. Then Officer Lenhardt transported the victim to the scene for a show-up, and the victim identified respondent during the show-up. When asked what he did after the identification, Watts replied that "we" performed a search incident to an arrest on the scene and located several phones in respondent's pockets, including a white Samsung with a red case. Watts then identified photographs of a pair of sunglasses and several phones which were found in respondent's pockets and which included the victim's phone. The officers subsequently inventoried the

phones and showed the white phone to the victim which he identified as belonging to him.

¶ 42    On cross, defense counsel showed Watts an "Evergreen Park Police Department Prisoner Inventory Form" for respondent which, Watts testified, did not indicate that any cell phones were recovered from respondent.  This document, which was marked Defense Exhibit No. 1 for identification, was not offered into evidence and is not part of the appellate record.

¶ 43    On cross, Watts testified that he was not in the vehicle with J.B. when J.B. was brought to "the Potbelly area."  Watts agreed that the description of the offenders which he had received was: one male wearing a purple jumpsuit, one male in all black clothing and a third male wearing a white t-shirt with a "do-rag."  Respondent was the one wearing dark clothes. Watts testified that he was the officer who searched respondent on the street and recovered the cell phones.

¶ 44    On redirect, Watts explained that he inventoried the phones as evidence and entered them on an evidence log.  As a result, they did not appear on the prisoner inventory which was completed later by Officer Linn.

¶ 45                              C. Officer Linn

¶ 46    Officer David Linn testified that he had been a police officer with Evergreen Park for almost five years.  On July 31, 2013, Officer Linn received a call in the early evening, sometime after 5 p.m., concerning a robbery and he

16

"observed four subjects matching the description at 95th and Western," and he stopped two of them. However, respondent was not among the two people who Linn stopped. Linn was across the street from respondent. When asked whether he had any contact with respondent, Linn replied that he inventoried respondent's personal property at the police station. Linn made an in-court identification of respondent and also identified photographs of a "sim card" which Linn stated that he had located in respondent's front left pocket and which was subsequently identified as belonging to the victim.

¶ 47        On cross, Linn testified that he was standing across the street from respondent when respondent was initially searched on the street.

¶ 48                D. Exhibits and Motion for Directed Finding

¶ 49        The State then offered the photographs of the cell phones and the SIM card into evidence, and defense counsel objected to the photos of the cell phones on the ground that the State had not laid an adequate foundation to show that these phones had been recovered from respondent. The trial court overruled the objection and admitted the photos into evidence. The State then rested.

¶ 50        Defense counsel then moved for a directed finding on the ground that the victim's identification was weak and based in part on the fact that the police told him that they had recovered his property from respondent. The trial court denied the motion, and the defense called its first witness.

¶ 51                                  E. Officer Lenhardt

¶ 52        Officer Lenhardt, who did not testify to his first name, stated that he was employed with the Evergreen Park police.  On July 31, 2013, at 5:15 p.m., he was on patrol when he responded to a call concerning a robbery by three black men.  The police dispatch described the offenders' clothing, as follows:  one was wearing a purple jacket, a second was all in black and a third was in a white shirt.  Lenhardt traveled to the address provided for the victim and spoke to the victim's mother, who informed him that the victim and his father were driving around looking for the offenders.  The victim returned to the home, and Lenhardt spoke to him there.  Other police units advised Lenhardt that they had stopped suspects fitting this description at 95th Street and Western, so Lenhardt drove the victim and his father to the scene for a show-up identification.

¶ 53        Lenhardt testified that there were three people in his squad vehicle: himself, the victim and the victim's father. This testimony by Linn contradicted J.B.'s testimony that, after his father drove him back to his house, J.B. entered the police vehicle, while his parents remained at the house.  J.B. also had testified that, at the show-up identification, he was alone in the police vehicle with one other officer.

¶ 54        Lenhardt testified that, when their vehicle arrived on the scene, police units were already there and four suspects had been stopped.  Lenhardt

18

identified respondent in court as one of the individuals present at the show-up identification. J.B. was able to make a positive identification of one suspect, who was not respondent. With respect to the other three males, "[h]e said he was not sure."

¶ 55    On cross, Lenhardt testified that J.B. identified the suspect, for whom he made a positive identification, as one of the boys who had slapped him in the face. J.B. indicated that there was another one but J.B. seemed a little confused. J.B. did not identify the boy on the street who was now wearing a purple jacket because he observed his face and knew that boy was not involved.

¶ 56    On redirect, Lenhardt testified that he "personally didn't take anyone into custody." The defense then rested.

¶ 57                     III. Adjudication and Sentencing

¶ 58    During closing argument, defense counsel argued that "this case rises and falls on identification." By contrast, the State argued that this case did not rise and fall on identification because the victim's phone was found on respondent.

¶ 59    After hearing argument on March 14, 2014, the trial court found respondent guilty of all three counts in the petition for wardship; and the written sentencing order, entered on the same day, specifically stated that respondent was found guilty of counts I, II and III of the petition.

¶ 60     The report of the probation officer, issued on April 25, 2014, indicated that respondent was then 17 years old; that his school attendance, behavior and report card were all satisfactory; and that the victim, who had been slapped a total of six times during the offense, did not suffer any injuries requiring medical attention and that he had his property returned to him. The officer "recommend[ed] 5 years probation, 30 hours of community service, a TASC referral, mandatory school and no gangs, guns or drugs." TASC stands for "Treatment Alternatives for Safe Communities." The report made no mention of a mandatory probation period.

¶ 61     At the sentencing on May 2, 2014, the State asked for five years of probation, without any reference to a mandatory period of probation. The prosecutor stated only: "This was a trial. Minor was found guilty of robbery. We will be asking for 5 years probation."

¶ 62     The only reference to the mandatory probation period was made by the APD who responded to the State's request by stating:

> "Unfortunately the way the law is written, we can't do anything less than 5 years. I wish we could because it sounds like a situation where 5 years of probation might be overkill in terms of the amount of services. He is 17. So I think that the probation will probably terminate at 21 unless there is a change in the law."

¶ 63    The trial court then concluded:  "I am going to accept the recommendation of the Probation Officer.  I will place [the] minor on 5 years probation.  He is to perform 30 hours of community service."  The trial court also ordered mandatory school, no gang activity, no gun possession, no drugs and a referral to TASC.  The court also entered a restraining order with respect to the victim.

¶ 64    After announcing sentence, the trial court advised respondent of his appellate rights, including that any "notice of appeal must be filed with the Clerk of the Court within the next 30 days."  The written sentencing order, entered the same day, also states:  "Appeal rights given."

¶ 65                    IV. Late Notice of Appeal

¶ 66    On June 9, 2014, an assistant State Appellate Defender filed a late notice of appeal on behalf of respondent.  The notice had been due 30 days after respondent's May 2 sentencing, and so it was approximately one week late.  Ill. S. Ct. R. 606(b)  (eff. Feb. 6, 2013)  ("the notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from").  "[T]he filing of the notice of appeal is jurisdictional." Ill. S. Ct. R. 606(a) (eff. Feb. 6, 2013).

¶ 67    On August 5, 2014, the assistant State Appellate Defender moved this court for leave to file the late notice of appeal, pursuant to Illinois Supreme

Court Rule 606(c) (eff. Feb. 6, 2013). Rule 606 is part of article 6, which specifically governs "Appeals in Criminal Cases, Post-Conviction Cases, and Juvenile Court Proceedings." See also Ill. S. Ct. R. 660(a) (eff. Oct. 1, 2001) ("Appeals from final judgments in delinquent minor proceedings, except as otherwise specifically provided, shall be governed by the rules applicable to criminal cases."). Rule 606(c) provides:

> "(c) Extension of Time in Certain Circumstances. On motion supported by a showing of reasonable excuse for failing to file a notice of appeal on time filed in the reviewing court within 30 days of the expiration of the time for filing the notice of appeal, or on motion supported by a showing by affidavit that there is merit to the appeal and that the failure to file a notice of appeal on time was not due to appellant's culpable negligence, filed in the reviewing court within six months of the expiration of the time for filing the notice of appeal, in either case accompanied by the proposed notice of appeal, the reviewing court may grant leave to appeal and order the clerk to transmit the notice of appeal to the trial court for filing." Ill. S. Ct. R. 606(c) (eff. Feb. 6, 2013).

¶ 68     In support of respondent's motion, the assistant State Appellate Defender submitted an affidavit stating that the assistant State Appellate

22

Defender was not appointed until June 9, 2014, and that respondent had relied on his trial counsel to perfect the appeal. Ill. S. Ct. R. 606(a) (eff. Feb. 6, 2013) ("The notice [of appeal] may be signed by the appellant or his attorney."). This court granted respondent's motion on August 11, 2014, and the State has not objected on jurisdictional grounds. This appeal followed.

¶ 69                                   ANALYSIS

¶ 70        As we already stated above on this direct appeal, respondent requests this court: (1) to vacate his theft adjudication because it stems from the same physical act as his robbery adjudication and thus violates the one act, one crime rule (*e.g., Dressler*, 317 Ill. App. 3d at 387-88 (vacating defendant's theft charge under the one act, one crime rule because it stemmed from the same act as his armed robbery charge)); and (2) to modify his sentence of five years' probation so that it terminates on his twenty-first birthday as required by the Act (705 ILCS 405/1-1 *et seq.* (West 2012)). Section 5-755 of the Act provides that: "The wardship of the minor *** automatically terminates when he or she attains the age of 21 years ***." 705 ILCS 405/5-755 (West 2012); *In re Jaime P.*, 223 Ill. 2d at 534 (holding that there is a "jurisdictional cap of 21 years" on the 5-year probation requirement). The State agrees and joins in both these requests, and we so order them.

¶ 71 In addition, respondent argues: (1) that his trial counsel was ineffective for failing to file a motion to quash arrest either before or during trial; and (2) that the mandatory probation provision of section 5-715(1) of the Act (705 ILCS 405/5-715 (West 2012)) violates his equal protection rights under the federal and state constitutions. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2.

¶ 72 For the following reasons, we do not find these claims persuasive, and we affirm his adjudication of delinquency for robbery and battery but vacate his theft adjudication and modify his five-year sentence of probation to terminate on his twenty-first birthday, which will be on January 16, 2018.

¶ 73                          I. Ineffective Assistance of Counsel

¶ 74 Respondent's first claim is that his trial counsel was ineffective for failing to file a motion to quash his arrest both before and during trial.

¶ 75                          A. The *Strickland* Test

¶ 76 Every Illinois defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Illinois State Constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; People *v. Domagala*, 2013 IL 113688, ¶ 36. Our supreme court has held: "There is no question that a minor charged with committing an offense, like [respondent] here, is entitled to the effective

assistance of counsel in juvenile delinquency proceedings." *In re Danielle J.*, 2013 IL 110810, ¶ 31.

¶ 77          Claims of ineffective assistance are judged against the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Domagala*, 2013 IL 113688, ¶ 36 (citing *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland* for Illinois)).  The same *Strickland* standard that is used in adult criminal cases is also "utilized to gauge the effectiveness of counsel in juvenile proceedings."  *In re Danielle J.*, 2013 IL 110810, ¶ 31 ("The standard utilized to gauge the effectiveness of counsel in juvenile proceedings is the *Strickland* standard, used in criminal cases."). Under *Strickland*, to prevail on a claim of ineffective assistance, a defendant must show both: (1) that counsel's performance was deficient; and (2) that this deficient performance prejudiced defendant.  *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687).

¶ 78          To establish the first prong, that counsel's performance was deficient, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms."  *Domagala*, 2013 IL 113688, ¶ 36.  To establish the second prong, that this deficient performance prejudiced the defendant, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

25

been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). "A reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome" – or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair. *People v. Colon*, 225 Ill. 2d 125, 135 (2007); *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 79     Although the *Strickland* test is a two-prong test, our analysis may proceed in any order. Since a defendant must satisfy both prongs of the *Strickland* test in order to prevail, a trial court may dismiss the claim if either prong is missing. *People v. Flores*, 153 Ill. 2d 264, 283 (1992).

¶ 80                                    B. Pretrial Motion

¶ 81     Respondent's first claim with respect to trial counsel is that she was ineffective for failing to move before trial to suppress the arrest. However, the appellate record is completely devoid of the documents provided by the State to defense counsel prior to trial. From this record, we do not know what defense counsel did, or did not know, before trial, and it is thus impossible for us to conclude "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36.

¶ 82     It is the appellant's burden to provide this court with a sufficient record to grant the relief he requests on the claims that he raises. *Chicago Province of the*

*Society of Jesus v. Clark & Dickens, L.L.C.*, 383 Ill. App. 3d 435, 443 (2008). If he fails to do so, we will resolve all doubts arising from incompleteness against the appellant. *Courts of Northbrook Condominium Ass'n v. Bhutani*, 2014 IL App (1st) 130417, ¶ 42 (" 'As a general rule, it is the appellant's burden to provide a sufficiently complete record *** and all doubts arising from incompleteness *** will be resolved against the appellant.' " (quoting *People v. Salinas*, 383 Ill. App. 3d 481, 489-90 (2008))); *City of Chicago v. Jeron*, 2014 IL App (1st) 131377, ¶ 9 ("we will dismiss an appeal if the appellant fails to supply" an adequate record (citing *Wackrow v. Niemi*, 231 Ill. 2d 418, 428 n.4 (2008) (without a sufficient record, "a reviewing court will presume that the order entered by the trial court was in conformity with the law and had a sufficient factual basis"))). Thus, we lack a basis for ruling in respondent's favor on his claim of pretrial ineffectiveness.

¶ 83       Respondent asks this court to speculate from three events *at trial* that counsel must have known *before trial* about the police's lack of probable cause for respondent's arrest. The three trial events identified by respondent are: (1) counsel's opening statement in which she asked the trial court to "pay careful attention to the testimony that involves the identification"; (2) counsel's effective cross-examination of the victim about his identification; and (3) counsel's decision, after she exposed on cross the weaknesses of the victim's

identification, to call as a witness the one officer who was in the squad vehicle with the victim during the show-up identification. None of these facts demonstrates counsel's knowledge prior to trial that the victim would waffle at trial about whether he had identified respondent on the street.

¶ 84     Counsel's effective cross-examination was built carefully by following up on the victim's prior answers. For example, counsel began her cross by repeating a statement that the victim made on direct examination and pressing the victim to clarify. The victim then admitted that he had told the officers only that he "recognized [respondent] there." When counsel immediately followed up by asking the victim "exactly [what] did you say to the officers," the victim explained that he had said "I think that's him who was there," but then later at the police station, when "they brought [respondent] in," the officers told him that they had found his phone on respondent. So counsel followed up with "[s]o you never actually picked out my client at the scene of the Potbelly's, is that right?" Counsel's effective cross-examination is not proof that she knew, prior to trial, that the victim's show-up identification was not strong and conclusive.

¶ 85     In sum, this record does not establish what defense counsel did, or did not know, before trial, and thus we cannot conclude "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*,

2013 IL 113688, ¶ 36. Since respondent does not satisfy the first prong of the *Strickland* test on his pretrial ineffectiveness claim, we do not find this claim persuasive.

¶ 86                                   C. Trial Motion

¶ 87        Respondent argues in the alternative that, if this court finds the record insufficient to demonstrate counsel's pretrial knowledge, counsel was then ineffective for failing to move during the trial itself to quash the arrest.

¶ 88        For this claim, respondent argues based on the trial testimony: (1) first, that the police lacked reasonable suspicion to justify their initial *Terry* stop of respondent; and (2) second, the police lacked probable cause for the subsequent arrest because (a) the victim had failed to identify respondent during the show-up identification, and (b) the victim's phone was not discovered on respondent until the ensuing search incident to arrest.

¶ 89        We will analyze each of these claims below.

¶ 90                                   D. Types of Seizures

¶ 91        The instant case involves two different types of seizures: a *Terry* stop and an arrest.

¶ 92        Both the fourth amendment to the United States Constitution (U.S. Const., amend. IV) and article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, § 6) protect both adults and juveniles from unreasonable

searches and seizures. *People v. Colyar*, 2013 IL 111835, ¶ 31 (adults); *People v. Lopez*, 229 Ill. 2d 322, 345 (2008) (juveniles); see also *In re Lakisha M.*, 227 Ill. 2d 259, 278 (2008) ("the search and seizure provision of the Illinois Constitution" provides the same rights to juveniles as the fourth amendment to the United States Constitution).

¶ 93        Our supreme court has recognized that not every encounter between the police and a private citizen results in a seizure, and it has identified three tiers of police-citizen encounters. *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006); see also *In re Lakisha M.*, 227 Ill. 2d at 267 ("no court has ever held that a juvenile is entitled to greater fourth amendment protections by reason of her minority"). These are: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions or *Terry* stops, which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) consensual encounters, which involve no coercion or detention and thus do not implicate fourth amendment interests. *Luedemann*, 222 Ill. 2d at 544. Of these three types of encounters, only *Terry* stops and arrests qualify as fourth amendment seizures which require a valid justification. *Luedemann*, 222 Ill. 2d at 544.

¶ 94        In the instant case, the State has argued: (1) that the on-the-street show-up identification was a *Terry* stop; (2) that this identification provided probable cause for an arrest; and (2) that the discovery of a number of cell phones,

including the victim's phone, on respondent's person was part of a search incident to an arrest. In response, respondent argues: (1) that the police lacked reasonable suspicion for the *Terry* stop; and (2) that the officers also lacked probable cause for the subsequent arrest. Respondent does not argue either that the show-up identification exceeded the scope of an otherwise valid *Terry* stop or that the search of respondent's person exceeded the scope of a search incident to an arrest.

¶ 95                             E. Reasonable Suspicion

¶ 96        First, we address respondent's claim that the police lacked reasonable suspicion to justify the initial *Terry* stop.

¶ 97        To conduct a *Terry* stop, an officer must have a reasonable, articulable suspicion that an individual was involved in criminal activity or is armed and dangerous. *In re Rafael E.*, 2014 IL App (1st) 133027, ¶ 25 (citing *People v. Tate*, 367 Ill. App. 3d 109, 115 (2006)). The officer must have this valid justification for seizing the individual at the moment of the seizure. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (a court evaluates the facts "available to the officer at the moment of the seizure"); *In re Rafael E.*, 2014 IL App (1st) 133027, ¶ 25 (the officer must have had a "valid justification for seizing respondent at that time" (citing *People v. Smith*, 331 Ill. App. 3d 1049, 1054 (2002))). In determining whether the officer had a reasonable suspicion, a court

considers the totality of the circumstances known to the officer at the time. *In re Rafael E.*, 2014 IL App (1st) 133027, ¶ 25 (citing *People v. Byrd*, 408 Ill. App. 3d 71, 87 (2011)).

¶ 98     This "totality of the circumstances" includes both facts and any reasonable inferences that may be drawn from those facts, but excludes mere hunches.  As the United States Supreme Court first observed in the landmark case of *Terry*, 392 U.S. at 21, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  See also *In re Rafael E.*, 2014 IL App (1st) 133027, ¶ 26 (" 'An investigatory stop of a private citizen is allowed only when the police officer has specific, articulable facts which, when taken together with rational inferences, create a reasonable suspicion that the private citizen is involved in criminal activity.' " (quoting *People v. Lockhart*, 311 Ill. App. 3d 358, 361 (2000))).  Although an officer may draw inferences in light of his or her past experience, he or she cannot act on the basis of a mere hunch.  *Terry*, 392 U.S. at 27; *In re Rafael E.*, 2014 IL App (1st) 133027, ¶ 26 ("Mere hunches and unparticular suspicions are insufficient." (citing *People v. Smith*, 331 Ill. App. 3d 1049, 1054 (2002))).

¶ 99     The officer does not have to personally observe the commission of a crime in order to make a stop; rather, he is required to possess only enough

facts which lead him "reasonably to conclude in light of his experience that criminal activity may be afoot," and that this particular individual may be involved. *Terry*, 392 U.S. at 30; *In re Rafael E.*, 2014 IL App (1st) 133027, ¶ 26 (the officer does not have "to actually observe the commission of a crime" (citing *People v. Estrada*, 394 Ill. App. 3d 611, 616 (2009))).

¶ 100    After the officer identifies specific facts and articulates the inferences he or she drew in light of his or her experience, then the court reviews this information against an objective standard: would the facts available to the officer at the moment of the stop warrant a reasonable person in believing that the stop was justified? *Terry*, 392 U.S. at 21-22. "[S]imple 'good faith on the part of the arresting officer is not enough.' " *Terry*, 392 U.S. at 22 (quoting *Beck v. Ohio*, 379 U.S. 89, 97 (1964). " 'If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate ***.' " *Terry*, 392 U.S. at 22 (quoting *Beck v. Ohio*, 379 U.S. 89, 97 (1964)).

¶ 101    In the instant case, we simply do not know which officer stopped respondent. Detective Watts testified that he arrived during the detention, but that Officer Linn had already detained respondent. By contrast, Linn testified that he stopped two other men but not respondent. Thus, to the extent that we need to analyze the facts and circumstances known to the officer who made the stop, we do not even know which officer that was. Since respondent did not

challenge the stop in the court below, the facts surrounding the stop are not clear.

¶ 102       Even if we were to assume that Watts was correct and that Linn stopped respondent, Watts was not asked what, if any, other information Linn possessed, besides that the suspects fit "the description." Similarly, Linn was not asked what, if any, information he possessed specifically about respondent prior to the stop, because he testified that he did not stop respondent. In addition, the appellate record does not contain the information that was in the police reports, by or about Officer Linn or anyone else. As a result, we do not know what were the totality of facts and circumstances known to Officer Linn at the time that he made the initial decision to stop respondent – even if we were to assume that he was the one who made it.

¶ 103       Although we may consider the collective knowledge of all the officers who are working together to investigate a crime, that collective knowledge must, at the very least, *include* the knowledge of the officer who actually made the stop. *People v. Ortiz*, 355 Ill. App. 3d 1056, 1065 (2005).

¶ 104       The record below was simply not developed for the purpose of assessing the validity of the stop, and it does not contain sufficient information for us to do so now.

¶ 105     Since respondent never challenged the stop in the trial court, the State was under no obligation to justify it. Unfortunately now, on the appellate level, it is impossible to turn back the clock and ascertain which officer stopped respondent, and determine the totality of facts and circumstances known to him and which facts contributed to his suspicion.

¶ 106     Thus, we are not persuaded by respondent's claim that counsel was ineffective for failing to move at trial to quash his arrest on the ground that the officer who initially stopped him lacked reasonable suspicion to do so.

¶ 107                              F. Probable Cause

¶ 108     Next, respondent claims that Detective Watts lacked probable cause to arrest respondent. Detective Watts testified that he arrested respondent after the show-up identification and performed the search incident to arrest, while they were still on the street.

¶ 109     "While we review determinations of probable cause *de novo*, we will not disturb the trial court's findings of fact unless they are against the manifest weight of the evidence." *People v. Ollie*, 333 Ill. App. 3d 971, 980 (2002) (citing *Ornelas v. United States*, 517 U.S. 690, 698-99 (1996)). However, in the instant case, since this issue was not raised before the trial court, the trial court did not make any factual findings with respect to probable cause.

¶ 110    An arrest made without either a warrant or probable cause violates an individual's constitutional right to be free from unlawful searches and seizures. *Ollie*, 333 Ill. App. 3d at 980 (citing *People v. Melock*, 149 Ill. 2d 423, 436 (1992)). In the instant case, the arresting officer did not have a warrant, so the arrest is valid only if he had probable cause. *People v. Grant*, 2013 IL 112734, ¶ 11; *People v. Sims*, 192 Ill. 2d 592, 614 (2000) (a warrantless arrest is valid only if the officer had probable cause). Probable cause exists where the facts and circumstances known to the arresting officer at the time of the arrest would lead a reasonable person to believe that a crime had occurred and the suspect had committed it. *Grant*, 2013 IL 112734, ¶ 11; *Sims*, 192 Ill. 2d at 614; *Ollie*, 333 Ill. App. 3d at 980.  In the instant case, respondent does not claim that the officers lacked probable cause to believe that a crime had occurred.  As a result, the only issue is whether they had probable cause to believe that respondent committed it.

¶ 111    When determining whether probable cause existed, we consider the totality of the circumstances known to the arresting officers when they made the arrest. *Grant*, 2013 IL 112734, ¶ 11 (we consider "the totality of circumstances at the time of the arrest"); *People v. Sims*, 192 Ill. 2d 592, 615 (2000) (courts consider "the totality of the circumstances at the time of the arrest"); *People v. Clay*, 55 Ill. 2d 501, 504 (1973); *People v. Arnold*, 349 Ill. App. 3d 668, 672

36

(2004) (we consider "the totality of the circumstances known to the police at the of a suspect's arrest"). "Where officers are working together in investigating a crime, the knowledge of each constitutes the knowledge of all, and probable cause can be established from all the information collectively received by the officers." *Ortiz*, 355 Ill. App. 3d at 1065.

¶ 112    "In deciding the question of probable cause in a particular case the courts deal with probabilities and are not disposed to be unduly technical. These probabilities are the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act." *Clay*, 55 Ill. 2d at 504-05. See also *Grant*, 2013 IL 112734, ¶ 11 ("Whether probable cause exists is governed by commonsense considerations ***."); *Sims*, 192 Ill. 2d at 615 ("a determination of probable cause is governed by common sense, practical considerations, and not by technical legal rules").

¶ 113    While mere suspicion is not enough to establish probable cause, the evidence relied upon by the arresting officer does not have to be sufficient to prove guilt beyond a reasonable doubt. *Sims*, 192 Ill. 2d at 614-15; *People v. Arnold*, 349 Ill. App. 3d 668, 671-71 (2004) (probable cause requires more than a mere suspicion but not proof beyond a reasonable doubt). Since " 'an arrest not only serves the function of producing persons for prosecution but also serves an investigative function, courts have not ruled that an arrest can occur

only when the known facts indicate that it is more probable than not that the suspected individual has committed the crime.' " *Sims*, 192 Ill. 2d at 615 (quoting *People v. Lippert*, 89 Ill. 2d 171, 178 (1982)). "[T]he calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt." *Grant*, 2013 IL 112734, ¶ 11.

¶ 114    The defendant has the ultimate burden of proving a lack of probable cause. *People v. Arnold*, 349 Ill. App. 3d 668, 672 (2004). Factors which may contribute to probable cause include a suspect's proximity to the crime scene (*Sims*, 192 Ill. 2d at 617), and identification of the suspect by someone with knowledge (*Sims*, 192 Ill. 2d at 617).

¶ 115    In the instant case, Detective Watts, the arresting officer, testified unequivocally that the victim identified respondent during the show-up identification. On appeal, respondent asks us, in essence to discount the validity of Watts' testimony, because Watts stated that he was not in the vehicle with the victim while the victim identified respondent. However, Watts was never questioned about how he knew the results of the identification. Thus, it is not possible for us to assess the validity of Watts' statement. We cannot go back now and cross-examine Watts about the source of his knowledge.

¶ 116    As part of the defense case, respondent called Officer Lenhardt, who was in the vehicle with the victim during the show-up identification. Lenhardt

testified that the victim made a positive identification of one of the four males and that this person was not respondent. On direct, Lenhardt testified that, with respect to the other three males, the victim "said he was not sure." However, on cross, Lenhardt testified that the victim "did indicate there was another one." Lenhardt was not asked if this other one was respondent. Thus, Lenhardt's testimony does not contradict Watts' testimony that the victim identified respondent during the show-up identification.

¶ 117    During direct examination, the victim testified that he identified respondent during the show-up identification. About the show-up, the victim was asked:

"ASA:  And were you able to identify anyone?

J.B.:  Yes.

ASA:  And was the Minor Respondent one of the persons you identified?

J.B.:  Yes.

ASA:  And what did you identify him as having done that day to the police officer?

J.B.:  I said that's one of the kids that slapped me."

Thus, on direct examination, J.B. testified that he had identified respondent at the show-up identification.

¶ 118    However, during cross, the following exchange occurred:

"DEFENSE COUNSEL:  Okay.  So it wasn't until you were back at the police station and the police had actually showed you a photo of my client and told you that the phone was found on his person that you identified him, is that correct?"

J.B.:  Yes."

This exchange cast doubt on his earlier testimony on direct that he had identified respondent during the on-street show-up.

¶ 119    However, on redirect, J.B. clarified his testimony, explaining that during the show-up:  "I identified [respondent] as one of the main guys who was talking to me that whole time at the park,"  but "I had doubt until they pulled up his picture and showed me at the station close-up."  Thus, J.B.'s testimony confirmed Detective Watts' assertion that J.B. identified respondent at the on-street show-up, thereby providing probable cause for respondent's immediate arrest.

¶ 120    Next, on recross, the defense counsel asserted that J.B. did not "know" of respondent's involvement at the show-up and J.B. agreed with a "yes."  But the significance of his answer hinges on how J.B. interpreted the word "know."  The word "know" is often defined as:  "To be certain of; regard as true beyond doubt."  The American Heritage Dictionary, 705 2d ed. (1982).  J.B. had just

testified on redirect that he had "doubt," and a reasonable "doubt" does not preclude a finding of probable cause. *Grant*, 2013 IL 112734, ¶ 11 ("the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt"). Thus, his answer on redirect does not dispel his prior testimony.

¶ 121    In the instant case, probable cause was provided by: (1) respondent's physical proximity to the crime scene, and the short time that elapsed since the offense; (2) the presence of distinctive clothing, such as the purple jacket with a black stripe on the sleeves; and (3) the identification of respondent by the victim shortly after the offense. *Sims*, 192 Ill. 2d at 617 (proximity to the crime scene and identification by a person with knowledge contribute to probable cause). Even a tentative identification may contribute to probable cause. *People v. Myles*, 83 Ill. App. 3d 843, 851 (1980) (a "tentative photographic identification" by a security guard, who said " 'This looks like one of them,' " was sufficient to establish probable cause), *rev'd on other grounds*, 86 Ill. 2d 260 (1981); *People v. Henderson*, 20 Ill. App. 3d 120, 121, 123 (1974) (a "tentative identification" by a victim, who had "a close look" at his assailant, was sufficient to provide probable cause for a warrantless arrest). See also *People v. Grant*, 38 Ill. App. 3d 62, 69 (1976) (a "wavering" identification contributed to probable cause); *People v. Patterson*, 9 Ill. App. 3d 183, 183

41

(1972) (motion to suppress a tentative identification was properly denied). Although "a conviction cannot be sustained beyond a reasonable doubt *solely* by an identification of the accused which is vague, doubtful or uncertain," the issue before us is probable cause, not guilt beyond a reasonable doubt. (Emphasis in original.) *People v. Graham*, 179 Ill. App. 3d 496, 506 (1989).

¶ 122     Since respondent has not met his burden to show a lack of probable cause (*Arnold*, 349 Ill. App. 3d at 672), we cannot say that the lack of a suppression motion during trial rendered counsel's performance "objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36 (to show ineffectiveness, respondent must show "that counsel's performance was objectively unreasonable under prevailing professional norms"). Thus, we do not find persuasive respondent's ineffectiveness claim.

¶ 123                    II. Mandatory Probation

¶ 124     Respondent claims that the mandatory five-year probation contained in section 5-715(1) (705 ILCS 405/5-715(1) (West 2012)) violates his right to equal protection.

¶ 125                    A. Preliminary Matters

¶ 126                    1. Standing

¶ 127     As a preliminary matter, we observe, first, that since we are granting the defense's and the State's request to terminate respondent's probation on his

twenty-first birthday, he is not actually being subjected to the mandatory five-year term of probation but only to a term which is less than four years. Respondent, who was born on January 16, 1997, will turn 21 years old on January 16, 2018, which is less than four years after he received his sentence of probation on May 2, 2014.

¶ 128    Second, it is not clear from the sentencing record that the trial court imposed a five-year term because of the statutory section. The trial court stated only that it was adopting the probation officer's recommendation, and the probation report made no reference either to the statutory section at issue here or to the fact that a five-year term was mandatory.

¶ 129    However, the State has not claimed that respondent lacks standing to make this claim, and standing is an affirmative defense which, if not asserted, is waived. *E.g., Crudup v. Sims*, 292 Ill. App. 3d 1075, 1081 (1997) (because lack of standing is an affirmative defense which, if not raised, is waived, it should not be addressed, *sua sponte*, by the appellate court). Thus, we will address respondent's sentencing claim.

¶ 130                                  2. Waiver

¶ 131    Respondent admits that he raises this issue for the first time on appeal. Normally, to preserve a sentencing issue for appellate review, an adult criminal respondent must object both at the sentencing and in a subsequent posttrial

motion. *People v. Pryor*, 2014 IL App (1st) 121792-B, ¶ 23 ("To preserve a sentencing issue for appellate review, a defendant must both object at sentencing and raise the issue in a postsentencing motion." (citing *People v. Hiller*, 237 Ill. 2d 539, 544 (2010), and *People v. Easley*, 2012 IL App (1st) 110023, ¶ 16)).

¶ 132    However, a juvenile defendant is excused from the requirement of raising an issue in a posttrial motion and thus is required to object only at the sentencing itself in order to preserve a sentencing issue for appellate review. *In re Samantha V.*, 234 Ill. 2d 359, 368 (2009) ("a minor must object at trial to preserve a claimed error for review," although "minors are not required to file a postadjudication motion"). In the instant case, respondent failed to object even at sentencing.

¶ 133    Nonetheless, the issue is not waived for our review. As respondent correctly observes, a constitutional challenge to a statute may be raised at any time. *In re J.W.*, 204 Ill. 2d 50, 61 (2003). In *In re J.W.*, a minor defendant was adjudicated delinquent and raised for the first time, on appeal, constitutional challenges to certain statutorily-mandated aspects of his probation. *In re J.W.*, 204 Ill. 2d at 54, 61. The State argued that he had waived any challenges to his probation by failing to raise them before the trial court. *In re J.W.*, 204 Ill. 2d at

61. Our supreme court rejected this argument, holding that a constitutional challenge to a statute may be raised at any time. *In re J.W.*, 204 Ill. 2d at 61-62.

¶ 134     In the instant case, as in *In re J.W.*, respondent is a minor who was adjudicated delinquent and who is now raising a constitutional challenge to a statutorily-mandated aspect of his probation, for the first time on appeal. As our supreme court held in *In re J.W.*, this issue is not waived, and the State does not argue otherwise. See also *People v. Wright*, 194 Ill. 2d 1, 23 (2000) ("a challenge to the constitutionality of a criminal statute may be raised at any time"); *People v. Rush*, 2014 IL App (1st) 123462, ¶ 9; *People v. Bailey*, 396 Ill. App. 3d 459, 462 (2009) ("While it is true, and defendant concedes, that he did not preserve this issue accordingly, we note that we are dealing with a constitutional challenge involving the validity of a statute. Such an argument may be presented at any time, regardless of a violation of technical waiver rules.").

¶ 135                              B. Standard of Review

¶ 136     Although this constitutional issue is not waived for our review, respondent still bears the burden of proof. It is well established that "a party challenging the constitutionality of a statute has the burden of establishing its invalidity." *In re J.W.*, 204 Ill. 2d at 62; *People v. Dinelli*, 217 Ill. 2d 387, 397

(2005) (the burden is "on the party challenging the validity of the statute" (internal quotation marks omitted)); *Wright*, 194 Ill. 2d at 24.

¶ 137    All statutes are presumed to be constitutional. *Dinelli*, 217 Ill. 2d at 397; *In re J.W.*, 204 Ill. 2d at 62; *Wright*, 194 Ill. 2d at 24.  A court must construe a statute so as to affirm its constitutionality, if reasonably possible.  *Dinelli*, 217 Ill. 2d at 397.  The question of whether a statute is constitutional is a question we review *de novo*.  *Dinelli*, 217 Ill. 2d at 397; *In re J.W.*, 204 Ill. 2d at 62.  *De novo* consideration means that we perform the same analysis that a trial judge would perform.  *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 138                      C. Statutory Section At Issue

¶ 139    In the instant case, respondent challenges section 5-715 of the Act, which provides in relevant part:

> "The juvenile court may terminate probation *** and discharge the minor at any time if warranted by the conduct of the minor and the ends of justice; provided, however, that the period of probation for a minor who is found to be guilty for an offense which is *** a forcible felony shall be at least 5 years."  705 ILCS 405/5-715(1) (West 2012).

¶ 140    Both parties agree that the above section is subject to section 5-755 of the Act which provides that:  "The wardship of the minor *** automatically terminates when he or she attains the age of 21 years ***."  705 ILCS 405/5-

46

755 (West 2012). Our supreme court already confronted this same issue and held that a reading of section 5-715(1) that would extend jurisdiction beyond the age of 21 is "contrary to the intent of the legislature and cannot be correct." *In re Jaime P.*, 223 Ill. 2d 526, 534 (2006). As a result, the supreme court held "that minors found guilty of those enumerated offenses shall be sentenced to 'at least 5 years' of probation, subject only to the jurisdictional cap of 21 years." *In re Jaime P.*, 223 Ill. 2d at 534 (quoting 705 ILCS 405/5-715(1) (West 1998)). See also *In re Luis R.*, 388 Ill. App. 3d 730, 731 (2009) (observing that, in *In re Jaime P.*, "the court resolved an apparent conflict in the application of provisions (1) setting a minimum probation term for certain delinquent minors and (2) automatically terminating juvenile probation upon the minor's twenty-first birthday"); *In re Jessica M.*, 399 Ill. App. 3d 730, 742 (2010) ("under the clear mandate of the legislature's provisions in the Juvenile Court Act, as interpreted by the Illinois Supreme Court in *In re Jaime P.*, we modify respondent's term of probation to terminate on" her twenty-first birthday).

¶ 141       Also, the above-quoted section refers to a "forcible felony," which is defined as including robbery, the charge that respondent was convicted of. 720 ILCS 5/2-8 (West 2012). Thus, by definition, the mandatory five-year probation requirement applies to respondent's adjudication.

47

¶ 142                          D. Respondent's Claims

¶ 143          Respondent claims that subjecting juvenile defendants who have been adjudicated delinquent of a forcible felony to a mandatory five-year probation violates the equal protection clauses of both the United States and Illinois Constitutions.

¶ 144          "The guarantee of equal protection requires that the government treat similarly situated individuals in a similar manner." *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 322 (1996). See also *People v. Breedlove*, 213 Ill. 2d 509, 518 (2004). While the United States and the Illinois Constitutions contain separate equal protection clauses (U.S. Const., amend. XIV (no "State" shall "deny to any person within its jurisdiction the equal protection of the laws"); Ill. Const. 1970, art. I, § 2 ("No person shall *** be denied the equal protection of the laws.")), the Illinois Supreme Court has chosen to apply the same analysis to Illinois constitutional claims that is used by federal courts to assess federal constitutional claims. *Jacobson*, 171 Ill. 2d at 322. While the equal protection guarantee does not preclude a state from enacting legislation that draws distinctions between different categories of people, a state is prohibited "from according different treatment to persons who have been placed by a statute into different classes on the basis of criteria wholly unrelated to the

purpose of the legislation." *Jacobson*, 171 Ill. 2d at 322. See also *Breedlove*, 213 Ill. 2d at 518.

¶ 145    In the instant case, respondent asks us to consider two different distinctions drawn by statute: (1) the distinction between juveniles convicted of forcible felonies and juveniles convicted of other crimes; and (2) the distinction between juvenile robbers and adult robbers. First, respondent argues that the mandatory probation requirement violates equal protection, because the purposes of the Act are not furthered by drawing a distinction between (1) juveniles who committed forcible felonies and (2) juveniles who committed other offenses. Second, he argues that the requirement violates equal protection by treating juvenile offenders more harshly than adult offenders, since the probation term for robbery is less than five years for an adult offender.

¶ 146    Where, as here, the challenged statute does not affect a fundamental right or involve a suspect class, courts review the statute only for a rational basis. *Breedlove*, 213 Ill. 2d at 518; *Jacobson*, 171 Ill. 2d at 323. Whether a rational basis exists for a classification presents a question of law which we consider *de novo*. *Jacobson*, 171 Ill. 2d at 322. Under the rational basis test, a court asks only if "the method or means employed in the statute to achieve the stated goal or purpose of the legislation is rationally related to that goal." *Jacobson*, 171 Ill. 2d at 323. See also *Breedlove*, 213 Ill. 2d at 518. The legislation carries a

strong presumption of constitutionality, and if any set of facts can reasonably be conceived to justify the classification, then it must be upheld. *Breedlove*, 213 Ill. 2d at 518; *Jacobson*, 171 Ill. 2d at 323.

¶ 147    To apply the rational basis test, a court must first identify the "stated goal or purpose" of the statute in question. *Jacobson*, 171 Ill. 2d at 323. In our case, Article V of the Act is the article which governs delinquent minors, and it sets forth its goals in its opening section. Section 101 of Article V provides:

"It is the intent of the General Assembly to promote a juvenile justice system capable of dealing with the problem of juvenile delinquency, a system that will protect the community, impose accountability for violations of law and equip juvenile offenders with competencies to live responsibly and productively. To effectuate this intent, the General Assembly declares the following to be important purposes of this Article:

(a) To protect citizens from juvenile crime.

(b) To hold each juvenile offender directly accountable for his or her acts.

(c) To provide an individualized assessment of each alleged and adjudicated delinquent juvenile, in order to rehabilitate and to prevent further delinquent behavior through the development of competency in the juvenile offender. As used in this Section, 'competency' means the

development of educational, vocational, social, emotional and basic life skills which enable a minor to mature into a productive member of society.

(d) To provide due process, as required by the Constitutions of the United States and the State of Illinois, through which each juvenile offender and all other interested parties are assured fair hearings at which legal rights are recognized and enforced." 705 ILCS 405/5-101(1) (West 2012).

¶ 148    The purpose and policy section, quoted above, was amended effective January 1, 1999, and our supreme court has acknowledged that this amendment "represent[ed] a fundamental shift from the singular goal of rehabilitation to include the overriding concerns of protecting the public and of holding juveniles accountable for violations of the law." *In re J.W.*, 204 Ill. 2d at 69 (citing *In re A.G.*, 195 Ill. 2d 313, 317 (2001)).

¶ 149    "Given the shift in the purpose and policy of the *** Act to include the protection of the public from juvenile crime and holding juveniles accountable, as well as the serious problems" presented by juvenile offenders who commit forcible felonies (*In re J.W.*, 204 Ill. 2d at 70), we find no merit in respondent's claim that drawing a distinction between forcible and nonforcible offenders does not further the Act's rational purpose of protecting the public and holding

juveniles accountable. See *In re J.W.*, 204 Ill. 2d at 70 (finding constitutional a statutory requirement that a 12-year-old juvenile defendant register as a sex offender for life).

¶ 150    The mandatory probation requirement still leaves the trial court with the tools to craft an individualized sentence and thus fulfill the Act's twin goal of rehabilitation. 705 ILCS 405/5-101(1)(c) (West 2012) ("To provide an individualized assessment *** in order to rehabilitate ***."). In respondent's case, the specific conditions of his sentence included 30 hours of community service, a referral to TASC, no gang activity, no gun possession and no drugs. Thus, the mandatory probation requirement is rationally related to the twin goals of the Act because it protects the public, while still allowing for an individualized sentence. For this reason, we do not find persuasive respondent's claim that the Act impermissibly draws a distinction between forcible and nonforcible offenders. *People v. J.F.*, 2014 IL App (1st) 123579, ¶¶ 9-15 (rejecting a minor defendant's argument that the five-year mandatory probation requirement violates equal protection by drawing a distinction between forcible and nonforcible offenders).

¶ 151    Respondent also argues that the mandatory probation requirement violates the equal protection clause by treating minors more harshly than adults. Respondent argues that an adult who commits robbery, which is a Class 2

felony (720 ILCS 5/18-1(c) (West 2012)), would be subject to a maximum of only four years of probation (730 ILCS 5/5-4.5-35(a) (West 2012)), rather than the mandatory five years imposed on a minor for the same offense.[3] However, what respondent overlooks is that, while an adult offender may receive a four-year probation term instead of a prison term (730 ILCS 5/5-4.5-15(a)(1) (West 2012)), the adult offender still faces the possibility of three to seven years of incarceration, followed by a mandatory supervised release term of two years upon release from imprisonment. 730 ILCS 5/5-4.5-35(a), (j) (West 2012). While a juvenile offender may be committed to the Department of Juvenile Justice for the same time period "for which an adult could be committed for the same act" (705 ILCS 405/5-710(7) (West 2012)), the juvenile offender still does not face adult incarceration[4] and thus the minor's possible sentence is inherently less harsh. *Cf. McKeiver v. Pennsylvania*, 403 U.S. 528, 553 (1971) (White, J., concurring) ("the consequences of adjudication are less severe than those flowing from verdicts of criminal guilt"); *In re Rodney H.*, 223 Ill. 2d 510, 520

---

[3] In the instant case, respondent will actually serve less than four years of probation, or less than an adult, since respondent's probation will terminate on his twenty-first birthday. However, as we discussed in the standing section above, the State waived this issue by not raising it.

[4] If the State files a petition to designate a juvenile proceeding as an extended jurisdiction juvenile prosecution, then a minor could face a possible sentence of adult incarceration. 705 ILCS 405/5-810 (West 2012). However, that was not done in this case and so is not an issue on this appeal.

(2006) (unlike an adult proceeding, the purpose of a juvenile proceeding is to protect, not punish, the minor).

¶ 152     In sum, we are not persuaded that a juvenile robber is treated more harshly than an adult robber, (1) where the juvenile probation is only one year longer than the maximum probation for an adult; (2) where a minor cannot be committed to the Department of Juvenile Justice for a longer term than an adult could be incarcerated for the same offense, and (3) where juvenile commitment is inherently less harsh than adult incarceration. See *J.F.*, 2014 IL App (1st) 123579, ¶ 16 (rejecting a minor defendant's argument that the five-year mandatory probation requirement violates equal protection by imposing a longer probation term on juveniles than on adults).

¶ 153     For these reasons, we do not find respondent's constitutional claims persuasive.

¶ 154                   CONCLUSION

¶ 155     In sum, we do not find respondent's ineffectiveness and equal-protection claims persuasive and we affirm his adjudication of delinquency for robbery and battery, but we vacate his theft adjudication and modify his five-year sentence of probation to terminate on his twenty-first birthday, January 16, 2018.

¶ 156     Affirmed as modified.